James PACE *v.* STATE of Arkansas

CR 78-182                                    580 S.W. 2d 689

Opinion delivered May 14, 1979
(Division II)

*Tom J. Keith,* Public Defender, for appellant.

*Steve Clark,* Atty. Gen., by: *Robert J. DeGostin, Jr.,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant James Pace was sentenced to consecutive terms of ten years for aggravated robbery and five years for theft of property, after a jury trial on a charge of robbing the Pizza Hut in Bentonville and taking $375 on February 17, 1978. He asserts the following points for reversal:

## I.

THE COURT ERRED IN REFUSING TO

SUPPRESS ORAL STATEMENTS MADE BY THE APPELLANT AT HIS APARTMENT WHERE HE WAS NOT ADVISED OF HIS CONSTITUTIONAL RIGHTS AND THE ORAL STATEMENTS MADE AT THE SHERIFF'S OFFICE AFTER BEING ADVISED OF HIS CONSTITUTIONAL RIGHTS.

## II.

IT WAS ERROR FOR THE TRIAL COURT TO DENY THE APPELLANT'S MOTION TO SUPPRESS EVIDENCE SEIZED BY A WARRANTLESS SEARCH.

## III.

IT WAS ERROR FOR THE TRIAL COURT TO ADMIT INTO EVIDENCE A RED KNIT CAP (STATE'S EXHIBIT NO. 2).

## IV.

IT WAS ERROR FOR THE TRIAL COURT TO DENY THE APPELLANT'S MOTION TO STRIKE STATE'S EXHIBITS NOS. 6, 7 AND 8.

We find no merit in them and affirm.

## I.

Appellant actually objects to, and sought to suppress, four separate statements. The first of these was made to police officers in the apartment where they found appellant. We need not give extensive consideration to his arguments that, because he was in custody and had not been given the warnings mandated by *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 ALR 3d 974 (1966), his first statement was involuntary. Pace was asked by one of the officers if anyone else had been at the apartment that night. His response that Scott Rhodes had been there ten or fifteen minutes earlier, changed his shoes and left through the back door, was exculpatory, not incriminating. It was not productive of any "poisonous tree" fruit. Instead, it caused the of-

ficers to be uncertain whether Pace was a suspect or a witness. In spite of the fact that, before Pace made this statement, one of three officers in Pace's apartment had drawn a weapon as Pace emerged from his bathroom at the request of these officers, the trial judge found that the circumstances indicated that having a weapon "at the ready," until it was discovered that Pace was not armed, was reasonable and that the officer "re-holstered" his weapon when it became apparent that Pace was unarmed, and we cannot say that this holding was erroneous. There is a proper basis for the trial judge's finding that the inquiries made by the officers at this stage were investigatory, not accusatory.

After a thorough suppression hearing, at which appellant neither testified nor offered any evidence, the trial judge made extensive findings of fact, and concluded with a holding that he saw no evidence in the record that the statements of appellant were anything other than voluntary. We cannot say that the court erred under the *Degler* standard, because we cannot say that these findings are clearly against the preponderance of the evidence. *Degler* v. *State*, 257 Ark. 388, 517 S.W. 2d 515. Neither can we say that an independent view of the totality of the circumstances dictates a result different from that reached by the trial judge.

Gary McVay, a Bentonville police officer, was told, at approximately 9:40 p.m. on February 17, 1978, that there had been a robbery at the Pizza Hut on Highway 71. He was the first police officer to arrive at the scene, but he was soon joined by Officer Holloway, another Bentonville policeman. After the manager of the Pizza Hut pointed out to McVay the direction taken by the robber when he left, McVay went to the back door and saw two sets of human tracks in the three to four inches of fresh snow on the ground. One of them led to the Pizza Hut and the other away. McVay, with the aid of his flashlight, followed the tracks that led away from the Pizza Hut for a distance of approximately five blocks, or 500 to 600 yards, to Apartment 7 of apartments in the 1300 block of South Main Street. He found only one set of footprints on the streets along the way. McVay said the tracks were so obvious, anyone could have followed them.

At 12th Street, along the route of the tracks, McVay was

joined by Deputy Sheriff Tom Hutcheson and by Deputy Sheriff John Green, each of whom was driving his police vehicle. Officer Holloway joined them when they reached the apartment. McVay knocked on the door and Kathy Workman answered. When McVay asked whether anyone else was there, she said that James Pace was in the apartment. She told McVay that she had been there all evening, but that Pace had taken Demarious (DiDi) Haney to work at about 5:00 p.m., and, after an absence of about two hours, returned and remained at the apartment. She told McVay that Pace was then in the bathtub, and, when McVay said he needed to talk to him, stepped aside from the door and started for the bathroom. McVay and Holloway then entered the apartment and McVay stepped halfway through the middle room and asked Pace to come out. Hutcheson then entered the apartment and also asked Pace to come out of the bathroom. Pace came out, holding a towel in front of him. Hutcheson had drawn his pistol and pointed it at the bathroom door. When Pace came out, Hutcheson told him to put the towel down. Pace did so and proved to be nude and unarmed. Hutcheson then put his weapon away. McVay said that he could tell by observing Pace's stomach muscles that Pace was breathing heavily, as if he had been running. When asked, Pace said that he had been at the apartment since approximately 8:30. It was then he made the statement about Scott Rhodes. McVay then went out the back door of the apartment and followed the tracks he found there to the Pizza Hut.

When the officers arrived at the apartment, Green, who went to cover the back door, noticed a set of tracks at the back entrance. McVay had looked at them before entering the apartment. McVay said that the tracks at the front door and those at the back seemed similar. It was then snowing lightly, and it appeared that the tracks at the back of the apartment were almost as fresh as those at the front, and McVay said that the two sets of tracks seemed to have been made at approximately the same time, but that those entering the apartment were fresher. When McVay followed the tracks leading away from the back door, they turned out to be the second set of tracks McVay had seen when he first went to the Pizza Hut.

When McVay left, Green, Hutcheson and Holloway were still at the apartment. While talking to Pace, McVay had seen Green pick up a pair of wet boots with some snow on them. Green had come into the apartment when he heard the voices of the other officers inside the apartment. At that time Pace was standing in the kitchen with McVay and Hutcheson. Green asked no questions, and apparently said nothing. Shortly after McVay left, the other officers left Pace and Workman in the apartment, after Green had told Pace not to leave because the officers would probably want to talk to him again. When Pace stated that he was to pick up his girl friend DiDi Haney at her place of employment at about 11:00 p.m., Green told him that would be all right, but that Pace should return to the apartment. Pace was not told that he was under arrest or in custody. According to Green, he thought that Pace might be a witness instead of a suspect, because of the statement about Rhodes, even though he knew at the time that Pace had said that Rhodes had changed into tennis shoes and that the tracks leading from the back door had not been made by tennis shoes. Hutcheson and Green searched the area for other footprints that might support Pace's story, but found none. Hutcheson said that the officers were then still in the investigatory stage. Green went back to the Pizza Hut and searched for other tracks there, but found no evidence that lent support to Pace's story.

McVay, Green, Hutcheson and Holloway met Don Harrelson, a criminal investigator for the Benton County sheriff's office, and reported their findings to him. Harrelson and Green then went to Pace's apartment and requested that he accompany them to the sheriff's office for questioning and Pace agreed to go. When asked what he would have done if Pace had not agreed, Green said that he probably would have taken Pace into custody. Pace was taken to the criminal investigation office, where he was given the "Miranda warnings" as to his constitutional rights, and signed a waiver of them on a form on which they were expressly stated. Harrelson testified that he read each item separately to Pace, and asked if he understood that right. Pace replied affirmatively each time, and Harrelson wrote "yes" after each item as the answer was given. It was after the completion of this process that Pace was asked to sign the waiver. This took place at 11:00 p.m.

Pace was interviewed by Harrelson for about 40 minutes. He made a statement in which he substantially repeated the statement he had previously made about Scott Rhodes. He said that Kathy Workman had been present in the apartment when Scott Rhodes was there. Harrelson then went to talk with Miss Workman, who had come to the sheriff's office along with DiDi Haney. Harrelson gave her the "Miranda warnings," after which Miss Workman told him that she had not seen Scott Rhodes and that she had prepared Pace's bath.

Harrelson again talked with Pace, after asking Pace if he wanted his rights read to him again and receiving a negative reply accompanied by a statement by Pace that he understood his rights. Pace then elaborated upon the story about Scott Rhodes. He said that Rhodes had come to Pace's house, had said that he was going to rob the Pizza Hut, and that Rhodes then had a four inch .30 caliber pistol. Pace said Rhodes was gone about 30 minutes, returned and gave Pace the money in a white pillow case and the pistol. Pace said that he had put the pistol, which Rhodes said he had stolen from John Martinez, in his attic. Pace also said that he had put the money in his own shoes and had intended to stash it when he went out to get DiDi, but had not done so.

Pace had been turned over to the jailers for booking. The jailers, Bob Ridout and Cecil Weatherford, conducted a strip search of Pace. They found a quantity of money in both his shoes. Ridout advised the investigating officers of this. After Pace's second statement, the investigating officers attempted to question Workman further, but she asked for an attorney. They also talked to Demarious Haney and then talked to Pace again. After the money was found, Pace decided that he wanted to tell the whole story. Harrelson said that he asked Pace if he knew his rights and if he wanted them read again. Pace said he knew his rights. He never asked for an attorney and did not ask the officers to stop the questioning. Harrelson said that Pace said:

I went to rob the Pizza Hut and I got back to the apartment and told Kathy when I got to the Pizza Hut some girl was talking on the telephone. I knocked her on her ass and then I ran home and got in the bathtub — I

got home, I dumped the money on the bed. Kathy said, "Where did you get this?" and I said, "I robbed something."

Harrelson also stated that Pace was asked, after making this statement, if he had a gun and told the officers where they could find it in the attic at his apartment under some "rags and papers and stuff" and gave explicit instructions as to how it could be found. Harrelson said that thereafter the pistol, a blue sweat jacket and a pillow case were recovered from the apartment and that Police Chief Dan Moody took charge of them. He said that this search was conducted on the basis of a written consent signed by Pace at 11:15 p.m.

Harrelson talked to Pace again on February 23, 1978, after Pace had said that he would give a full confession which could be recorded on tape. Harrelson said that Pace again signed a waiver of rights which had been read to him by Chief Moody. It was witnessed by Harrelson. Harrelson said that he had thought that the statement had been taped, but later found that the recording machine had not worked. He said that Pace had stated that he got the gun from John Martinez at Bella Vista, two days prior to the robbery, that the money found in his shoe was the money taken from the Pizza Hut, and that he had run back to the apartment on foot, describing the route he had taken. Harrelson said that he could not remember the route Pace described. Harrelson said that Pace had repeatedly said that he didn't want to tell some facts because he might get Kathy Workman in trouble.

The time that the officers actually placed Pace under arrest is unclear from the record. It may be that he was not actually arrested and "booked" until after his second statement at the sheriff's office, but there is also testimony from which it might be inferred that this took place after the first statement, made just after his arrival there. In our view, the officers' interpretation of the time of arrest is of little consequence. If the investigation had focused on Pace and his freedom of action was restricted when he was interrogated, he may have been considered as having been in custody, so far as interrogation is concerned. For the purposes of this opinion, we consider that Pace was in custody when he accompanied the officers to the sheriff's office, even though we do not agree

with appellant that the focusing of the investigation on Pace was equivalent to his being in custody. See *Reeves* v. *State,* 258 Ark. 788, 528 S.W. 2d 924. See also, *Oregon* v. *Mathiason,* 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977).

The exclusionary rule does not apply to voluntary statements and statements made without coercion, following proper advice as to constitutional rights, even though the accused was in custody at the time. *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 ALR 3d 974 (1966); *U.S.* v. *Joslyn,* 371 F.S. 423 (Ariz., 1974); *Hale* v. *State,* 252 Ark. 1040, 483 S.W. 2d 228; *O'Neal* v. *State,* 253 Ark. 574, 487 S.W. 2d 618; *Blanton* v. *State,* 249 Ark. 181, 458 S.W. 2d 373, cert. den. 401 U.S. 1003, 91 S. Ct. 1240 (1971). It appears to us that the state met its burden of proving that the statements of Pace were voluntary. We do not find any basis for holding that the interrogation was rendered coercive by reason of the fact that the officers took no steps to make it clear to appellant that he had no legal obligation to accompany them to the sheriff's office, as required by Rule 2.3, Arkansas Rules of Criminal Procedure, or by reason of the presence of his parole officer, Steve Bertschy, who had, on a previous occasion, caused appellant's apartment to be searched under a "white warrant." These facts were known to the trial judge. On the undisputed facts, we cannot say that the totality of the circumstances is such that the incriminating statements given by Pace were involuntary.

## II.

Appellant argues that evidence seized pursuant to a consent to search executed by him should have been suppressed because the officers violated Rule 11.5, Arkansas Rules of Criminal Procedure (Repl. 1977), by failing to advise Pace that he could withdraw or revoke this consent. When Harrelson was asked whether he had advised Pace, after he had been placed under arrest, that he could revoke the consent, Harrelson answered in the negative. According to Harrelson's version, however, Pace was not arrested until after the consent was signed and after the money was found in his shoes. Harrelson testified that the written consent to search was signed by Pace at about 11:15 p.m., during the interview at which he made his first statement at the sheriff's of-

fice. He said that he advised Pace that he did not have to sign it, that he could require Harrelson to attempt to get a search warrant and that he could revoke it. When cross-examined on his recollection about advising Pace that he had a right to revoke the consent, Harrelson said that he was sure that "we did because we always do. I don't just say that I vividly remember it, I can't say that." This statement falls short of establishing the lack of any basis for this officer's statement that he did advise Pace that he had a right to revoke the consent. Evidence of the habit of this officer or routine practice of the sheriff's officers in this regard was relevant on the question. Ark. Stat. Ann. § 28-1001, Rule 406 (Supp. 1977).

Furthermore, Rule 11.5, Rules of Criminal Procedure, does give one the right to withdraw or limit a consent previously given, but there is nothing in the rule requiring that the person giving the consent be advised of a right to revoke it. Appellant's reliance upon a commentary relating to a proposed section of the rules that was never adopted is misplaced. There is nothing to indicate that Pace ever desired to revoke the consent to search. His explaining in detail how the officers would find the pistol is certainly inconsistent with a desire to revoke a consent otherwise voluntarily given.

Appellant contends, however, that the consent could not have been voluntary because of coercive conditions existing at the time. These alleged conditions were the presence of his parole officer, Steve Bertschy, and illegal arrest or detention of appellant. There was evidence that Pace's apartment had been searched on a previous occasion under the authority of a "white warrant" issued by Bertschy, and that some of the officers conducting the investigation participated in that search. Although Bertschy was present during a substantial part of the interrogation, there is no evidence that he actually participated in it, or in Pace's arrest, or in the investigation of the crime. His presence, without taking steps to negate its effect, as appellant now contends he should have done, certainly did not render the consent involuntary, either when considered separately or in conjunction with all other factors. We find nothing to suggest that Pace's arrest was illegal.

## III.

At about 11:00 p.m. William Hall, another Bentonville police officer, went with Holloway to search for physical evidence. He backtracked the tracks leading from the front door of the Pace apartment. He described the tracks as distinctive. He picked up a red cap he described as a "ski mask type of cap," beside the tracks, about 200 or 300 feet, or "four houses," north of Pace's apartment. The cap was turned inside out and had two eye holes cut in it. The word "Arkansas" was printed on the side. Hall said that it matched the description of a cap worn by the robber.

Appellant objected to the introduction of this cap because McVay did not find it when he followed the tracks from the Pizza Hut to the apartment. He now argues that none of the three witnesses who were present at the time of the robbery testified that the cap was similar or identical to the "red ski mask" worn by the person who committed the robbery. It is easy to understand how McVay could have failed to see the cap. Hall testified that he almost "missed the cap" and Hall was looking for physical evidence, while McVay was concentrating on following the tracks. Appellant made no objection in the trial court on the ground that the witnesses who saw the robber did not identify the cap, or because of the alleged dissimilarity of the cap, on the bases that it was not designed and constructed as a ski mask and none of the witnesses mentioned the word "Arkansas" in describing the cap. We do not consider such matters when they are raised for the first time on appeal. Furthermore, error cannot be predicated upon a ruling admitting evixdence unless a timely objection is made stating the specific ground of objection if the ground is not apparent from the context. Ark. Stat. Ann. § 28-1001, Rule 103(a)(1) (Supp. 1977). At any rate, we find no error. Appellant's objections argued here really go to the weight to be given this piece of evidence, but not to its admissibility. The objection made in the trial court really goes to the question of relevance, and we find no error on that ground.

## IV.

While Bentonville Police Chief Moody was testifying

during the trial, he identified certain objects found in a search of Pace's apartment. He testified that two searches were made. Green and Hutcheson participated in the first one. They did not find the jeans, jacket or pillowcase at that time. Moody thought that this search was made at about 11:00 p.m. and that a second search was conducted at about 1:00 a.m. The later successful search, according to him, was after Pace had told them where to find the weapon. Moody then observed that the jacket was marked "10:31 p.m." Moody thereafter testified that the jacket was found on the first search and that the officers were then admitted by an occupant of the apartment. He said that Demarious Haney, who lived at the apartment, had given consent to this search, and that Harrelson had possession of that written consent. Moody said that the other items were found on the occasion of the second search.

Each of the exhibits had been admitted into evidence after the trial judge had asked if appellant had any objection and appellant answered "no" or appellant's attorney had volunteered that he had no objection. Thereafter, the marking on the jacket was discovered. At the conclusion of the testimony of this witness, appellant's attorney said, "Your Honor, I move to strike" and the judge remarked, "I have already ruled on that." Doubtless, the judge referred to the hearing on the motion to suppress, at which he had upheld the search, saying that he found no wilful invasion of appellant's rights.

Appellant's attorney did not specify which of the exhibits should be stricken. In view of the testimony of Moody and testimony given by Harrelson, we find no error, at least as to those items found on the second search. Harrelson had said that he did not participate in a search until after the last statement was made by Pace. This commenced at 1:35 a.m. At the trial, Harrelson, who testified before Moody did, reiterated the statement that he participated in a search of the apartment at this time and that he was accompanied by Moody, Green and Hutcheson. Harrelson also testified that the apartment had been searched earlier without the gun having been found, but that he was not present. It was his recollection that the "coat" had been found on the first search. It was also Harrelson's recollection that Moody had

told Pace that the officers had been to his apartment and had not found the gun.

Green had testified at the suppression hearing that there had only been one search of the apartment and that it took place before the money was found in Pace's shoes. He stated, however, that the gun was found on that occasion and that Harrelson and Moody were present. All other evidence indicates that Harrelson never left the sheriff's office until after Pace had confessed and given directions for finding the gun. There was certainly a preponderance of the evidence to show that the successful search was conducted after Pace executed his written consent.

There was no basis for striking any of these exhibits. Even if the jacket was recovered on the first search, and even if that search preceded Pace's written consent, there is undisputed evidence that a proper consent had been given by an occupant of the premises. And even if the jacket should have been stricken, the evidence without the jacket is so overwhelming that the error, even if it is of constitutional proportions, is harmless, beyond a reasonable doubt. See *Freeman* v. *State,* 258 Ark. 617, 527 S.W. 2d 909; *Sims* v. *State,* 258 Ark. 940, 530 S.W. 2d 182; *McCoy Farms, Inc.* v. *J & M McKee,* 263 Ark. 20, 563 S.W. 2d 409; *Harrington* v. *California,* 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969); *Chapman* v. *Calif.,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, 24 ALR 3d 1065 (1967), reh. den. 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967); *Gilbert* v. *California,* 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967).

The judgment is affirmed.

We agree. HARRIS, C.J., HOLT and PURTLE, JJ.