Rickie Earn BERNA *v.* STATE of Arkansas

CR 83-153                              670 S.W.2d 435

Supreme Court of Arkansas
Opinion delivered June 4, 1984

*John R. VanWinkle* and *Fines F. Batchelor, Jr.,* for appellant.

*Steve Clark,* Atty. Gen., by: *Theodore Holder,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Ricky Earn Berna was convicted of three charges of kidnapping, one charge of rape and one of aggravated robbery; he received a life sentence plus eighty years. The evidence of Berna's guilt is overwhelming and that is a factor in reviewing any allegation of error. *See Pace* v. *State,* 265 Ark. 712, 580 S.W.2d 689 (1979); *Harrington* v. *California,* 395 U.S. 250 (1969); *Chapman* v. *California,* 386 U.S. 18 (1967). In reviewing Berna's arguments we find that no prejudicial error was committed and that he received a fair trial. Consequently, the judgment below is affirmed.

The facts are undisputed. On December 10, 1981, Linda Kay King was at home at Mulberry, Arkansas, with her two pre-school age daughters. Berna came to her door with a gun and a butcher knife, told her to open the door and make no noise. He tied her hands. She recognized him when he started questioning her about everyone he knew in Mulberry. He untied her so that she could put shoes on and when she was in the bedroom, she tried to get her husband's rifle. Berna took it away from her, tied her hands again and threatened to kill her. He put Mrs. King and her two daughters in the front seat of the Kings' car and drove around the vicinity for approximately seven hours. He threatened to kill Mrs. King several times, and, at one time when they were stopped, struck her and threw her to the ground when she tried to lock him out of the car. He put her and the children in the trunk. Later he stopped, took one of the daughters out of the trunk, and the evidence reflects that he sexually abused her, requiring her to undergo surgery later to correct the damage done. Mrs. King tried to tear her way into the car through the back seat but was unsuccessful. Berna left the three victims in a rural area where they walked until they found help. Mrs. King immediately contacted the authorities and late that night, with a warrant for his arrest, several law enforcement officers went to Berna's home where he was living with his mother. His mother told them that Berna was in the bedroom and was armed. For about an hour and a half the officers tried to get Berna to surrender. At one point a deputy sheriff, who knew Berna and had attended school with him, conducted the negotiations directly. Eventually Berna threw the keys to the King vehicle to the

deputy and told him where the vehicle was. Later Berna surrendered without further resistance. Two guns were confiscated, a .357 pistol and the Kings' rifle. Berna was taken to the police station where he was warned of his rights for the first time. He was committed to the Arkansas State Hospital for a mental examination on February 3, 1982, and the authorities reported that he was unable to assist in his defense. On an inquiry by the circuit court in December of 1982, the authorities reported that since his treatment Berna was capable of assisting in his defense and the matter was set for trial.

There are four main arguments made by the appellant. First, it is argued that the trial court erred in refusing to quash the jury panel. It was demonstrated in this case that the jurors were summoned by ordinary mail and not by certified mail as required by Ark. Stat. Ann. § 39-210 (Supp. 1983). Furthermore, the appellant placed a considerable number of statistics in the record to show a true cross-section of the community could not be obtained in Crawford County due to past practices and the statutes in effect. For example, it is argued that 225 names were drawn from the jury panel, yet only 55 showed up for examination. The circuit clerk testified that only 97 of those drawn were summoned. Some were excused by the circuit court, evidently for reasons permitted by Ark. Stat. Ann. §§ 39-107 and 108 (Supp. 1983). He argues that it is unconstitutional to summarily excuse, for example, persons over 65, dentists, clergymen, nurses and persons of other professions. There is no argument, however, how Berna was prejudiced by the jury panel in question. In two cases where we have considered irregularities regarding jury panels, we have stated that some prejudice must be shown in order to find grounds to reverse a conviction. *Walton* v. *State*, 279 Ark. 193, 650 S.W.2d 231 (1983); *Huckaby* v. *State*, 262 Ark. 413, 557 S.W.2d 875 (1977). No longer is it presumed that simply because an error is committed it is prejudicial error. In *McDonough Power Equipment, Inc.* v. *Greenwood*, ___ U.S. ___, 104 S.Ct. 845, 78 L. Ed. 2d 663 (1984), the Supreme Court said:

This Court has long held that '[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials. *Brown* v. *United States,* 411 U.S. 223, 231-232 (1973), quoting *Bruton* v. *United States,* 391 U.S. 123, 135 (1968), and *Lutwak* v. *United States,* 344 U.S. 604, 619 (1953). Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing case load. . . .

We have also come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered 'citadels of technicality.' *Kotteakos* v. *United States,* 328 U.S. 750, 759 (1946), quoting Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial Power, 11 A.B.A.J. 217, 222 (1925). The harmless error rules adopted by this Court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial. See *Kotteakos,* 328 U.S., 759-760.

Furthermore, in *Taylor* v. *Louisiana,* 419 U.S. 522 (1975), the Supreme Court said:

The States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare. *Rawlins* v. *Georgia,* 201 U.S. 638 (1906). It would not appear that such exemptions would pose substantial threats that the remaining pool of jurors would not be representative of the community.

In the case at bar there was no deliberate exclusion of any class of persons and certainly not of any large class of

persons. See *Waters* v. *State,* 271 Ark. 33, 607 S.W.2d 336 (1980). Since Berna is unable to show that he was prejudiced by the selection process and the jury panel in any way, his argument is without merit. We do not approve the procedure used but the question to us is whether there was prejudicial error.

Although the guns seized at Berna's residence were not introduced into evidence, the fact that he threw out the keys to the King vehicle and said they were the keys to the King vehicle was admitted into evidence. Also, an expert testified that he obtained a fingerprint of Berna's from the trunk of the King vehicle. The question is raised whether this evidence was the product of an illegal search and seizure or a custodial interrogation in violation of *Miranda* v. *Arizona,* 384 U.S. 436 (1966).

The deputy testified, out of the hearing of the jury, that when he was negotiating with Berna, Berna said "[L]ets talk about that bitch's car down the street." The deputy asked who he was talking about and Berna said, "the King woman's." When Berna asked if they knew where the car was, the deputy said no, and Berna told him where it was. The deputy asked what car and he said the Kings' car. Then Berna threw the keys out and told the officers to go and get it. There is no doubt that there were eight or ten armed police officers surrounding Berna's home and that they had a warrant for his arrest. But we find that the evidence was not the result of an "interrogation." The facts in this case are similar to those in the case of *State* v. *Porter,* 274 S.E.2d 860 (N.C. App. 1981), where a robbery suspect was being held at gunpoint by one policeman. A police supervisor asked over the car radio if the officer had found a bank bag. The suspect, who had not been given his rights, said: "The bank bag is in the car." The officer, who was at the scene, said: "What bank bag?" and the suspect said: "The bag from the robbery." The North Carolina court held that, while the defendant was clearly in custody, there had been no interrogation when the officer asked "What bank bag?" The North Carolina court, relying on the definition of interrogation given in *Rhode Island* v. *Innis,* 446 U.S. 291 (1980), said:

[A] voluntary in-custody statement does not become the product of an 'in-custody interrogation' simply because an officer in the course of appellant's narration, asks defendant to explain or clarify something he has already said voluntarily. Since there is no evidence here that defendant's statements were made in response to overbearing police questioning or other police procedures designed to elicit a statement, we conclude that they were the product of free choice and without the slightest compulsion of in-custody interrogation procedures.

The reasoning of the North Carolina court applies here. There was no "interrogation" and Berna was not compelled to say anything. The officers were trying to arrest him without injury to anyone. Berna, himself, initiated the conversation about crimes, or at least that is what the record reflects. The deputy sheriff could not have known that his questions would induce Berna to throw the keys out. Consequently, we find that none of the evidence that was admitted as a result of his arrest was obtained illegally.

An objection was made to a remark by the prosecuting attorney during closing argument. The remark was found to be improper by the trial court and the objection was properly sustained. The court informed the jury that counsel's remarks were not evidence. In his closing argument the prosecuting attorney, referring to testimony by a psychiatrist for the Arkansas State Hospital, said: ". . . But what did Dr. Rosendale tell you. He's been released; they can't hold him." When Dr. Rosendale was extensively examined and cross-examined, the defense questioned him about how long an accused ordinarily remained in the state hospital and Dr. Rosendale said usually a year without a civil commitment, then they had to be released. This could be the testimony that the prosecuting attorney was referring to in his argument. In any event the trial court found it was improper for him to make the statement, sustained the objection, and admonished the jury. We find no reversible error.

Berna was released from the hospital in December, 1982,

and found fit to stand trial. His counsel moved on March 1, 1983, for further funds for a local psychiatric witness and examination and for reevaluation by the state hospital. The trial court ordered all the physicians that treated Berna to speak with his counsel and ordered all his records be released. Since one of Berna's doctors, Dr. Sayed Hamed, had relocated in California, the court ordered that the county pay for all counsel to go to California where a video tape deposition was taken; the defense used the deposition. It is argued that the denial of further funds for a private examination of Berna by a psychiatrist and a reevaluation by the Arkansas State Hospital was error. Berna contends that since Ark. Stat. Ann. § 41-601 (Repl. 1977) makes insanity an affirmative defense he was denied due process by not being provided with the requested assistance to prove the defense. We do not find that in the circumstances in this case Berna was denied due process of law by the action of the trial court. Due process of law does not require the state to furnish expenses for an appellant to shop from doctor to doctor until he finds one who considers him mentally incompetent. *Hale* v. *State,* 246 Ark. 989, 440 S.W.2d 550 (1969). There were four people who examined Berna when he was in the state hospital. They were Dr. Hamed, Dr. Dan Donahue, Dr. Philip Mizell and Dr. Albert F. Rosendale. There was a disagreement among the staff as to Berna's mental condition. Dr. Hamed, who was used by the defense, was of the opinion that Berna was insane. That evidence was presented to the jury. Dr. Rosendale, who was of a different opinion, was called by the state and extensively examined and cross-examined by all the parties. We cannot say that the defendant was denied a fair trial in this case. It should be pointed out that the trial court appointed two, not one, counsel to represent Berna.

Under Ark. Stat. Ann. § 43-2725 (Repl. 1977), as put into effect by our Rule 11 (f), we consider all objections brought to our attention in the abstracts and briefs in appeals from a sentence of life imprisonment or death. In this case we find no prejudicial error in the points argued or in the other objections abstracted for review.

Affirmed.

ADKISSON, C.J., concurs; PURTLE, J., dissents; and HOLLINGSWORTH, J., concurs in part and dissents in part.

JOHN I. PURTLE, Justice, dissenting. I cannot agree that evidence of appellant's guilt is overwhelming. I have serious doubts as to his guilt. There is no question but that he committed the crimes for which he was convicted. However, his mental condition at the time of the commission of the crimes and at the trial is very uncertain. It would have been relatively easy to have returned him to the state hospital or to a regional treatment facility for the purpose of examination prior to trial. It would have cost far less than allowing the deposition of the doctor in California.

Within several weeks after appellant was arrested he was arraigned. He entered a not guilty plea by reason of mental disease or defect. He was sent to the state hospital on March 30, 1982, and found by the staff of the state hospital to be suffering from mental disease or defect to the degree that he was unable to assist effectively in his defense and was unable to appreciate the criminality of his conduct. In December, 1982, he was declared to be competent to stand trial and was released from the state hospital with a 30 day supply of medicine. He was tried the first week in May of 1983.

On March 1, 1983, the appellant sought further examination relating to his defense of mental defect. Although the trial was still two months away the court refused to have him reexamined or allow funds for an independent examination. In view of appellant's condition shortly after the crimes I believe justice demanded that he be given a current examination prior to trial. I think it was an abuse of discretion to refuse to have the appellant re-examined by the state hospital or to allow an independent examination.

Also, I wish to voice my objection to the manner in which juries are selected in Crawford County. When 70-75% of a selected panel are normally excused or fail to show up for duty at trial time it leaves the impression the jury wheel is really not being utilized although it was used to draw the

panel in the beginning. A defendant is entitled to know when and why panel members are excused from serving at his trial. If 75% of those selected are ineligible to serve there is something wrong with the use of the jury wheel. In the future I will vote to reverse any judgment from any county when the selection of a jury is as haphazard as is demonstrated here. Likely there was no intent to do wrong; nevertheless it leaves a bad impression.

HOLLINGSWORTH, J., joins this dissent as to the manner of jury selection.