Allen DUNLAP d/b/a AMERICAN ARCADE *v.* STATE of Arkansas

CR 86-138                                    728 S.W.2d 155

Supreme Court of Arkansas
Opinion delivered April 27, 1987

*John Wesley Hall, Jr.,* for appellant.

*Steve Clark,* Att'y Gen., by: *Clint Miller,* Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. Appellant was convicted of promotion of obscene material under Ark. Stat. Ann. § 41-3585.2 (Supp. 1985). He argues five points of appeal, but since none of the points involves the sufficiency of the evidence, we need not recite the facts. We affirm the conviction.

Appellant's first point is that the material statute, § 41-3585.2, is void for vagueness under the Free Speech and Due Process provisions of the first and fourteenth amendments to the Constitution of the United States.

In *Brockett* v. *Spokane Arcades, Inc.,* 472 U.S. 491 (1985), the Supreme Court gave a concise review of its holdings and guidelines in the field of obscene materials.

> *Roth* [*Roth* v. *United States,* 354 U.S. 476 (1957)] held that the protection of the First Amendment did not extend to obscene speech, which was to be identified by inquiring "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." *Id.,* at 489 (footnote omitted). Earlier in its opinion, *id.,* at 487, n. 20, the Court had defined "material which deals with sex in a manner appealing to prurient interest" as:
>
> > "*I.e.,* material having a tendency to excite lustful

thoughts. Webster's New International Dictionary (Unabridged, 2d ed., 1949) defines "prurient," in pertinent part, as follows:

" '. . . Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd . . .' "

"Pruriency is defined, in pertinent part, as follows:

" '. . . Quality of being prurient; lascivious desire or thought . . .'

"See also *Mutual Film Corp. v. Industrial Comm'n*, 236 U.S. 230, 242 (1915), where this Court said as to motion pictures: '. . . They take their attraction from the general interest, eager and wholesome it may be, in their subjects, but a *prurient interest may be excited and appealed to . . .'* (Emphasis added.)

"We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I., Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), *viz*:

" '. . . A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters . . .' See Comment, *id.*, at 10, and the discussion at page 29 *et seq*."

Under *Roth*, obscenity was equated with prurience and was not entitled to First Amendment protection. Nine years later, however, the decision in *Memoirs v. Massachusetts*, 383 U.S. 413 (1966), established a much more demanding three-part definition of obscenity, a definition

that was in turn modified in *Miller v. California*, 413 U.S. 15 (1973). The *Miller* guidelines for identifying obscenity are:

> "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, *Kois v. Wisconsin*, [408 U.S. 229] at 230, quoting *Roth v. United States, supra*, [354 U.S.] at 489; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 24.

*Miller* thus retained, as had *Memoirs*, the *Roth* formulation as the first part of this test, without elaborating on or disagreeing with the definition of "prurient interest" contained in the *Roth* opinion.

The statute at issue was obviously drafted pursuant to the guidelines set out in *Miller* v. *California*, 413. U.S. 15 (1973). Appellant argues, however, that the *Miller* majority was slim; that the composition of the Supreme Court of the United States has changed since 1973; and that in the more recent case of *Kolender* v. *Lawson*, 461 U.S. 352 (1983), the Supreme Court has established a new vagueness analysis under which the critical inquiry is whether an allegedly vague statute encourages arbitrary, discriminatory enforcement by police, prosecutors, judges, and juries.

We recognize the difficulty in defining obscenity. In fact, barely more than a decade after the Supreme Court defined obscenity in *Roth* v. *United States*, 354 U.S. 476 (1957), Justice Harlan in *Ginsberg* v. *New York*, 390 U.S. 629 (1968), stated "the subject of obscenity has produced a variety of views among members of the Court unmatched in any other course of constitutional adjudication. In the 13 obscenity cases [as of 1968] in which signed opinions were written, [there] has been a total of 55 separate opinions among the Justices." 390 U.S. at 704-5. True to form, in *New York* v. *Ferber*, 458 U.S. 747 (1983), there were four separate opinions. Although the Supreme Court has had

difficulty with the definition of obscenity, and even though the composition of the Supreme Court has changed, we are constrained to follow *Miller*. In addition, we are not convinced that the guidelines pronounced in *Miller*, and thus also our statutory definition of "obscene material," have been made constitutionally infirm by the opinion in *Kolender, supra*. In *Kolender*, which did not involve obscenity, the Court explained that "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357. The Court noted that although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, it has recently recognized that the more important aspect of the doctrine is the requirement that a legislature establish minimal guidelines to govern law enforcement. Thus, even if the Court has recently focused more attention on the second phase of the analysis, it was nevertheless a consideration before *Kolender*. Further, even if we examine the statute with special emphasis on the question of whether it encourages arbitrary, discriminatory enforcement, we find that it does not. Our obscenity statutes provide sufficient guidelines to law enforcement personnel to prevent arbitrary, discriminatory enforcement.

Ark. Stat. Ann. § 41-3585.1(4) (Supp. 1985) defines "obscene material":

(4) "Obscene material" means that material which:

(a) Depicts or describes in a patently offensive manner sadomasochistic abuse, sexual conduct, or hard-core sexual conduct;

(b) Taken as a whole, appeals to the prurient interest of the average person, applying contemporary statewide standards; and

(c) Taken as a whole, lacks serious literary, artistic, political, or scientific value.

Appellant argues that the statute is additionally void for vagueness because it uses the term "prurient interest of the average person" in subsection (4)(b) which is undefined in the

statute and which no longer has any substantive meaning. Appellant quotes several dictionary definitions of "prurient" from 1935 forward and argues that the more recent definitions do not contain "shamefulness" or "morbidness," but rather describe normal human responses which cannot be considered obscene; that the jury was instructed that " '[p]rurient interest' is a morbid, sick, or shameful interest in sex, as distinguished from a normal interest in sex"; that two defense witnesses, Dr. Stevens and Dr. Moneypenny, testified that "average persons" do not have "morbid, sick or shameful interests in sex"; that the term is thus vague and confusing and cannot provide notice; and, therefore, use of the term in our statute makes it void for vagueness. This argument is also without merit.

According to appellant's own history of Webster's definitions, the 1961 edition did not use the terms "shameful" or "morbid" in defining "prurient," yet in *Miller, supra*, which was decided in 1973, the Supreme Court used the term "prurient" in establishing guidelines for defining "obscenity." Further, the Court has continued to use the term "prurient interest" in discussing obscenity cases, and the definition of that term contained in the jury instruction in the instant case was tacitly approved by the Supreme Court as recently as 1985 in *Brockett* v. *Spokane Arcades, Inc.*, 472 U.S. 491 (1985).

Further, the term "appeal" is defined as follows:

1. An earnest or urgent request, entreaty, or supplication. 2. A resort or application to some higher authority, as for sanction, corroboration, or decision . . . 3. The power of attracting or of arousing interest . . .

*The American Heritage Dictionary of the English Language* 62 (1981).

After examining our statute as a whole, we are convinced that the legislature intended for the word "appeals," in the following statutory definition of "obscene material," to have the first definition quoted above:

(4) "Obscene material" means that material which:

. . .

(b) Taken as a whole, *appeals* to the prurient interest of the

average person, applying contemporary statewide standards;

(Emphasis added.)

Thus, "obscene material" is that which, taken as a whole and applying contemporary statewide standards, *attempts* to activate prurient interests. The average person is quite capable of making that determination and whether or not the material is successful in doing so is beside the point.

As mentioned previously, our obscenity statute was obviously drafted pursuant to the guidelines established in *Miller*. The first of those guidelines is: "whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, . . ." *Miller*, 413 U.S. at 24. At first blush, it might seem that the legislature had mistakenly transposed the words of the *Miller* guideline and, thereby, created a new concept by using the phrase "prurient interest of the average person." However, in *Hamling* v. *United States*, 418 U.S. 87, 128-30 (1974), the Supreme Court stated:

> Petitioners contend that the District Court's instruction was improper because it allowed the jury to measure the brochure by its appeal to the prurient interest not only of the average person but also of a clearly defined deviant group. Our decision in *Mishkin* v. *New York*, 383 U.S. 502, 16 L. Ed. 2d 56, 86 S. Ct. 958 (1966), clearly indicates that in measuring the prurient appeal of allegedly obscene materials, *i.e.*, whether the "dominant theme of the material taken as a whole appeals to a prurient interest in sex," consideration may be given to the prurient appeal of the material to clearly defined deviant sexual groups. Petitioners appear to argue that if some of the material appeals to the prurient interest of sexual deviants while other parts appeal to the prurient interest of the average person, a general finding that the material appeals to a prurient interest in sex is somehow precluded.

> . . .

> The jury was instructed that it must find that the materials as a whole appealed generally to a prurient interest in sex.

In making that determination, the jury was properly instructed that it should measure the prurient appeal of the materials as to all groups. Such an instruction was also consistent with our recent decision in the *Miller* case. We stated in *Miller*:

"As the Court made clear in *Mishkin v. New York*, 383 U.S., at 508-509 [16 L. Ed. 2d 56], the primary concern with requiring a jury to apply the standard of 'the average person, applying contemporary community standards' is to be certain that, *so far as material is not aimed at a deviant group*, it will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person — or indeed a totally insensitive one." 413 U.S., at 33, 37 L. Ed. 2d 419 (emphasis added).

The legislature's phrasing of subsection (4)(b) does not violate the standard established in *Miller* and further explained in *Hamling*. Consequently, it does not render the statute void for vagueness.

Appellant's final vagueness argument is that the statute uses a circular definition which ordinary persons cannot understand in defining "obscene material." He argues that the result of the circularity is that, in effect, our statute defines "obscene material" as a patently offensive depiction done in a patently offensive manner. This argument is also without merit and requires little discussion. Again, Ark. Stat. Ann. § 41-3585.1 (Supp. 1985) provides the following definition of "obscene material":

(4) "Obscene material" means that material which:

(a) Depicts or describes in a patently offensive manner sadomasochistic abuse, sexual conduct, or hard-core sexual conduct;

. . .

"Sadomasochistic abuse," "sexual conduct," and "hard-core sexual conduct" are all defined in the same statute as follows:

(2) "Hard-core sexual conduct" means patently offensive

acts, exhibitions, representations, depictions, or descriptions of:

(a) Intrusions, however slight, actual or simulated, by any object, any part of an animal's body, or any part of a person's body into the genital or anal openings of any person's body.

(b) Cunnilingus, fellatio, anilingus, bestiality, lewd exhibitions of the genitals, or excretory functions, actual or simulated.

. . .

(8) "Sadomasochistic abuse" means flagellation, mutilation, or torture by or upon a person who is nude or clad in undergarments or in revealing or bizarre costume, or the condition of being fettered, bound, or otherwise physically restrained on the part of one so clothed, in a sexual context.

(9) "Sexual conduct" means human masturbation or sexual intercourse.

The statutory definition read as a whole, and not as appellant has abbreviated it, is simply not circular.

Appellant's second point of appeal also contains subpoints. He argues that the trial court erred in barring him from presenting evidence of the general availability of sexually explicit adult materials in the Little Rock metropolitan area at the time of the alleged offense as evidence of tolerance of the material or of community standards. He further argues that the trial court thereby shifted to him the burden of proving community standards which violated the due process clause. The arguments have no merit.

Appellant proffered testimony that several commercial sources of material similar to that in question were "fairly busy" when visited by the witness. All of the commercial sources were located in the Little Rock metropolitan area. The trial court ruled that the testimony was not admissible. The ruling was correct for a number of reasons.

In *Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49 (1973), decided on the same day as *Miller, supra*, the Court held that it

was not error for the trial judge "to fail to require" expert evidence that the materials were obscene when the materials themselves were placed in evidence. "The films, obviously, are the best evidence of what they represent." 413 U.S. at 56. Footnote 6 to the foregoing sentence provides in pertinent part:

> This is not a subject that lends itself to the traditional use of expert testimony. Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. Cf. 2 J. Wigmore, Evidence §§ 556, 559 (3d ed.) (1940). No such assistance is needed by jurors in obscenity cases; indeed the "expert witness" practices employed in these cases have often made a mockery out of the otherwise sound concept of expert testimony. *See United States* v. *Groner*, 479 F.2d ——, —— (slip opinion, at 19-20) (1973); *id.,* —— (slip opinion, pp. 24-25) (Ainsworth, J., concurring). "Simply stated, hard core pornography . . . can and does speak for itself." *United States* v. *Wild*, 422 F.2d, at 34, 36 (CA2 1970), cert. denied, 402 U.S. 986, 29 L.Ed. 2d 152, 91 S. Ct. 1644 (1971).

Here, the State met its burden of proof of obscenity by introducing the materials themselves. No separate proof of community standards was necessary. Appellant was not required to prove that the materials were not obscene, nor was he required to prove community standards. The fact that he chose to offer such proof does not mean that the burden was shifted.

The trial judge ruled correctly in excluding the proffered evidence. The proffered evidence would have tended to prove only that similar hard-core pornographic materials could be purchased at other locations in the Little Rock area.

As set out in J. Monahan and L. Walker, *Social Science in Law: Cases and Materials* 118 (1984): "Surveys of the jurisdiction in which prosecution is initiated, employing the specific magazine or film implicated in the charge, are frequently commissioned in obscenity cases. Usually, but not always, they are commissioned by the defense. Their admissibility is a function of the validity of the researcher's methodology." Here, as in *United States* v. *Boltansky*, 346 F. Supp. 272 (D.C. Md. 1972), the trial court found that the survey was unrepresentative of the

community standard, and that it would be more confusing than probative in determining whether the material was obscene. The ruling was correct because the availability of similar illicit material would not necessarily show acceptance of the material. *Hamling* v. *United States*, 418 U.S. 87, 125-26 (1974). Even if availability did in some manner demonstrate acceptability, a survey of nine establishments selling obscene materials in the state's most urban area would not be representative of a statewide standard, as is required. *See* Ark. Stat. Ann. § 41-3585.1(4)(b) (Supp. 1985). We do not reverse a trial court's ruling on the admissibility of evidence unless there is a clear abuse of discretion. The survey had no validity in methodology. *David* v. *State*, 286 Ark. 205, 691 S.W.2d 133 (1985). There was no abuse of discretion in excluding the evidence.

Appellant's third allegation of error is that the trial court wrongly refused to permit him to prove that community standards would tolerate the materials which he promoted; the court wrongly refused to permit him to argue the point to the jury; and, the court wrongly denied his proffered instruction on the issue. Again, the arguments are without merit.

Appellant renews his argument that he should have been allowed to put on proof of the availability of obscene materials at other places in the Little Rock area as evidence that community standards would tolerate the materials. The evidence was not admissible for the reasons previously stated. Since the proffered evidence was not admitted, the trial court ruled correctly in refusing to allow argument about that evidence.

The trial court instructed the jurors that they were not to judge the allegedly obscene material on the basis of their personal opinions, but were to consider the material on the basis of a community standard encompassing all levels of sensitivity, of religiousness and of economic, educational, and social standings. This instruction sufficiently covered the issue and the trial court did not commit reversible error by refusing to give appellant's requested instruction on the same issue. *Henderson* v. *State*, 284 Ark. 493, 684 S.W.2d 231 (1985).

Appellant next argues that the trial court erred in refusing to let him put on evidence of the context in which the material was sold, in refusing to let him argue about the context of the sales,

and in refusing to instruct the jury on the use of context as a factor in determining the community standard. Appellant does not specify a particular evidentiary ruling which he contends is erroneous. He only states: "Appellant made several attempts to put into evidence the context of the dissemination of the material as bearing on the issue of obscenity. The State did not object to some of it, but it did object to quite a bit pertaining to the context of dissemination and to closing argument on that issue and the trial court sustained those objections."

On direct examination of one of his witnesses, appellant put into evidence a large photograph of his business building which shows a sign on the front door that provides "Members Only." His attorney called a police detective to the witness stand and on direct examination elicited the following:

Q.  And when you come up outside, it has a sign that's — That tells you it's an adult establishment?

A.  Yes, sir.

Q.  So you're aware of that going in?

A.  That's correct.

Q.  Did you ever become a member of that club when you went in to buy the evidence?

A.  Yes. I had to purchase a membership before I was allowed access into the club.

Five pages of transcript later the following question and answer took place:

Q.  And there's a sign that tells you that you have to be eighteen to get in?

A.  Yes, sir.

After the above answer was completed, the State objected. A lengthy dialogue (four pages of transcript) between the attorneys and the court took place, and the court ultimately sustained the objection but did not strike the answer. Appellant made no offer of proof on any additional "contextual" material.

Since appellant did not tell us which ruling relating to the context of promotion of materials he thinks is erroneous, we can

only assume it is the one set out above. In it, the question was answered before an objection was made, so appellant could not possibly have suffered any prejudice, even if the subsequent ruling had been erroneous. In fact, the trial court later asked the prosecutor why he was making an issue over the matter since it was already in evidence.

Appellant argues that the trial court erred in prohibiting him from arguing about the context of the rule. However, he does not set out such a ruling, and we do not find one in the abstract. The colloquy on the subject which we find in the abstract is as follows:

> BY THE COURT: Why do we need to get into it a great deal more?

> BY MR. HALL [Appellant's Attorney]: Because I can argue to the jury, I believe, that they can determine the community standards based on the context in which this material was disseminated. That is, an adult establishment, limited solely to adults. Nobody was forced to come in off the street in there. [A]nd the State's offered jury instruction even refers to the average adult in the community.

> BY THE COURT: It doesn't say anything about minors in there whatsoever. You can argue that just as well. There's no dispute as to all of that . . .

Appellant next argues that the trial court erred in refusing his proposed instruction on the subject of context. The trial judge ruled that the proposed instruction misstated the law, conflicted with other instructions, and would confuse the jury. The proposed instruction would have told the jury that the test of obscenity is whether the material was offensive to the clientele of appellant's store. Such an instruction would have constituted a misstatement of the law because the test is not whether appellant's clientele finds the material to be obscene, but rather whether the average person finds that the material appeals only to the prurient interest.

Appellant's final point of appeal is that the trial court erred in not sustaining his objection to comments made by the prosecutor in closing argument. The argument has no merit.

During appellant's closing argument, his attorney stated that the case involved "prosecution for an idea." In the State's closing argument the deputy prosecutor responded:

Now, I like Mr. Hall's representation that this is an idea.

. . .

The thing that really offended me about — Most about Mr. Hall is the freedom of choice. That this is an idea. And that somehow, that I'm trompling on ideas here. Ladies and gentlemen, there's many ideas in our society that we simply cannot tolerate. We have to have laws to prohibit those types of ideas. We — The fact that somebody may think that overthrowing the government of the United States, and setting up a dictatorship — That's an idea. But we've got to stop it, because it's wrong. And it's a decline in our community that we cannot tolerate.

Appellant objected, arguing that the law does not prohibit ideas but rather the conduct which furthers certain ideas. In response to appellant's objection, the trial court merely stated that, "I'm not going to talk about this. I'm going to let the jury decide this case on the instructions I've given you." Appellant did not pursue the matter and thus failed to get a ruling on his objection. He may not now pursue the matter on appeal. *Williams* v. *State*, 289 Ark. 69, 709 S.W.2d 80 (1986).

Even if we considered the court's statement to be the same as "objection overruled," we would not reverse because appellant is unable to show that he was prejudiced in any manner. *See Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984). The trial court's instructions made clear the elements of the charged offense and that counsel's arguments were not evidence. The jury is presumed to follow the court's instructions. *Hill* v. *State*, 275 Ark. 71, 628 S.W.2d 285 (1982). There is simply no reason for us to hold that the jury thought it was to convict appellant because of his "ideas" about pornography.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. I respectfully dissent. It is my opinion that Ark. Stat. Ann. § 41-3585.1—.2 (Supp. 1985)

is void for vagueness and amounts to the denial of due process and free speech. The statute does not define "obscene" in such terms as to give fair notice that sale or distribution of such materials is a violation of state law. The definition of "obscenity" has escaped definition; "obscenity" remains a rather amorphous concept until it is "defined" by a conviction.

Neither the statute nor our decisions have been able to define "obscenity" until after an arrest and conviction, and then it's too late. Our present statute is an obvious attempt to codify the definition found in *Miller* v. *California*, 413 U.S. 15 (1973). However, the statute failed in its attempt; instead the legislature enacted a statute that is so vague and uncertain as to practically require enforcement officers to act in a discriminatory and arbitrary manner in selecting arrestees. For example, § 41-3585.1(4)(b) describes "obscene material" as material which: "Taken as a whole appeals to the prurient interest of the average person, applying contemporary statewide standards . . ."

The *Miller* opinion states that:

> The basic guidelines for the trier of facts must be: (a) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interests; (b) whether the work depicts or describes, in a patently offensive way sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

Obviously even the drafters of the statute here in question did not know the meaning of the word "prurient." As used in the statute, the average person has a "prurient" interest. The *Miller* case did not so state.

Admittedly, I do not know the meaning of the word "prurient" and certainly cannot tell from our statute what it means. The average person should be able to read a law and understand what is prohibited before the act is done. Certainly this Court should be able to determine what will violate the law before reviewing the evidence. We cannot take this statute and give the words their plain meaning and define exactly what conduct is permitted and what conduct is prohibited.

The majority opinion takes several quotes from *Brockett* v. *Spokane Arcades, Inc.* 472 U.S. 491 (1985) as the basis for the decision. The first is an attempt to explain the holding in *Roth* v. *United States*, 354 U.S. 476 (1957), which defines prurient as "i.e., material having a tendency to excite lustful thoughts." The opinion then cites Webster's New International Dictionary indicating that "prurient" means: "Itching, longing, uneasy with desire or longing; of persons having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd . . ." The best quote of all is: "pruriency is defined, in pertinent part as follows: '. . . quality of being prurient . . . ' "

It seems to me that the statute and the precedent cited by the majority opinion are attempts to curb the thoughts of the average person. The first thing wrong with the statute is that it attempts to legislate statewide standards on obscenity and even goes so far as to prohibit cities from enacting contrary laws. Neither *Miller* nor any other case attempts to set *statewide* standards. Furthermore, *Miller* required contemporary community standards. The Arkansas statute makes no attempt to define "contemporary" or "community" standards, but instead attempts to set "statewide" contemporary standards anchored on a 1973 opinion.

The Arkansas statute is without doubt a laudable, but futile, attempt to control the sale and distribution of material which the average person in the state might consider indecent and immoral. However, instead of coming right out and stating what was prohibited in plain language, the legislature became entangled in a mass of conflicting statutes, opinions and ideas and enacted an impossible statute. There is a maxim that morals cannot be legislated. Neither can the minds of man be controlled. This attempt to do so must fail.

Nudity, sex, lust, desire and related topics have been present as long as man has existed. All of them are normal to humans. Laws cannot extinguish the thoughts and desires of man. Traffic in obscenity cannot exist without willing customers. None of the material was shown publicly nor was any person required to view it.

The majority quotes (4)(a) three or four times with a different meaning each time. The different meaning of words and acts is primarily what makes it near impossible to define an

appropriate statute warning people of what will and will not be allowed. No statute that I have read has defined "obscenity" in such terms as to notify the average person of what acts will violate the law. The definitions of obscenity will be different in the opinion of everyone attempting to define it.

The majority opinion is typified in the statement: "[I]t was not error for the trial judge to fail to require expert evidence that the materials were obscene when the materials themselves were placed in evidence." What more proof is needed to reveal that this is a case of not knowing how to define it or what it is "until we see it." The opinion goes on to state that the materials are the "best evidence of what they represent." The opinion is bottomed upon the statement: "*Here the state met its burden of proof of obscenity by introducing the materials themselves*" (emphasis added). The opinion continues by stating: "No separate proof of community standards was necessary." This completely ignores the *Miller* holding and is in fact contrary to the criteria stated in *Miller*. The net effect of the majority opinion is that "obscenity" cannot be defined but becomes apparent when the materials are presented to a trier of fact or to an appellate court. As the opinion states, the appellant was not required to prove that the materials were not obscene, but neither was the state required to prove the materials were obscene.

To be valid a statute must provide fair notice to dealers of newspapers, magazines, movies, video tapes and other methods for the exchange of ideas, that sale or distribution of such materials may bring prosecution. Justice Brennan, dissenting in *Miller*, stated: "[A]fter sixteen years of experimentation and debate I am reluctantly forced to the conclusion that none of the available formulas [on obscenity], including the one announced today, can reduce the vagueness to a tolerable level . . ."

I think the trial court here wrongly refused to allow proof of community standards. Availability of the same materials at many other retail and wholesale outlets in Pulaski County was, in my opinion, relevant and material. Acceptability is one criterion to be considered when trying to determine what constitutes obscenity. No reason is given for selection of the defendant for prosecution for doing that which others may continue to do. Apparently the legislature intended to "set a net large enough to

catch all *possible* offenders" and leave it to the prosecuting authorities to step in and select those who will be detained and punished. If this was the intent of the legislature, then it has been successful. The statute as it is written leaves the police and prosecutor in a position to proceed discriminately against persons or groups who incur disfavor. What is obscene to one policeman or prosecutor may not be obscene to another policeman or prosecutor. We should not invite arbitrary or erratic law enforcement. The trial court refused to allow evidence of tolerance in the community unless it was first shown that such materials were acceptable. Tolerance is quite different from acceptance, which connotes approval. The Court thus created an impossible and improper burden for the appellant.

Censorship violates the mandates of the First Amendment to the Constitution of the United States. There *are* limitations to the guarantee of free speech. However, such limitations are not relevant to the present situation. It is my opinion that Ark. Stat. Ann. § 41-3585.1—.2 is an impermissible intrusion into the right of freedom of speech and freedom of the press. However offensive the materials may be to some people, they may be completely acceptable to others. Since the trial court prohibited proof of tolerance in the community, we do not know how acceptable such materials may be to the community. Therefore, even if the statute is constitutional, the case should be remanded to allow proof on the question of whether these materials are considered obscene by state or community standards.