William WINFREY, Jr. *v.* STATE of Arkansas

CR 87-67                                    738 S.W.2d 391

Supreme Court of Arkansas
Opinion delivered October 19, 1987

*John H. Adametz, Jr.*, and *William H. Craig*, for appellant.

*Steve Clark*, Att'y Gen., by: *Robert A. Ginnaven III*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. A jury found the appellant guilty of the rape of Damon Franklin who was less than eleven years old; guilty of the rape of Adrian Adams who was also less than eleven years old; and guilty of attempt to commit the rape of Kesia Franklin, also less than eleven years old. Ark. Stat. Ann. § 41-1803 and § 41-701 (Repl. 1977). We reverse the judgments of conviction.

Soon after the crimes were reported, the prosecutor had one of his employees interview each of the three victims and make a written report setting out her impressions of the victims and some of their statements concerning the crimes. At trial, after the first victim had completed her direct testimony, the appellant's counsel moved for the state to produce the reports. See Ark. Stat.

Ann. § 43-2011.3 (Repl. 1977). The state responded that the reports were the work product of the state and production of them was not required. The trial court accepted the state's argument and ruled that appellant's counsel could view the reports, but not have copies of them, and could not use them for cross-examination purposes. The appellant assigns the ruling as error for different reasons.

First, appellant argues that the reports were "statements," and he was entitled to have the state produce them in accordance with Ark. Stat. Ann. § 43-2011.3(b) and (e). The cited statute provides, in part, that after a state's witness testifies on direct examination, the court shall, on motion by the defendant, order the state to produce any prior statement of the witness, which the state has in its possession, which relates to the subject matter of the witness' testimony. The statutory definition of "statement" includes "a substantially verbatim recital of an oral statement made by said witness to an agent of the state and recorded contemporaneously with the making of such oral statement." The key words in the latter quotation are "substantially verbatim recital." Among the factors to be taken into account in deciding whether a statement is substantially verbatim (not precisely verbatim) are the extent to which it conforms to the language of the witness, the length of the written statement in comparison to the length of the interview, whether quotations may be out of context, and the lapse of time between the interview and the transcription, which need be only contemporaneously, not simultaneously made. C. Wright, *Federal Practice and Procedure: Criminal 2d* § 436 (1982). In general, if there is no assurance that the witness said whatever is attributed to him in the report, then it would be grossly unfair for his credibility to be jeopardized by using the report on cross-examination. On the other hand, if the trial court can rest assured that the witness said whatever is attributed to him, then that part of the report containing the statements should be ordered produced for the defendant.

Selected colloquy between the prosecutor's employee, appellant's counsel, and the trial court, quoted below, shows that the statements of the witnesses contained in the reports were substantially verbatim, nothing was taken out of context, and the victims' words were quoted in writing at the time of the interview.

Q [Defense Attorney] And these reports that you made also include, do they not, statements directly attributed to the three children? Statements they made to you about what happened?

A [Prosecutor's employee] Actual statements word for word? I know I put—There are possibly some quotes that I wrote down, but not word for word.

Q Well, a substantial part of these three reports includes, as I understand it, what these three children told you either happened, or did not happen?

A Yes.

Q And it—Your reports are a true reflection of what the children told you?

A True.

Q And even though they were not formal statements, these are things that they told you that either happened, or did not happen?

A Right.

. . .

THE COURT: All right. Ms. Parker, at the time that you interviewed the three children, did you record your questions, and their responses, responses in that way with a question/answer type of thing that you're accustomed to seeing the Deputy Prosecutors take of a suspect, or a witness, or being done in court?

THE WITNESS: I usually do my interviews in a more informal way. I don't—It's not so much of a direct question, direct answer. It's more of a discussion the way that I, I talk with the children.

THE COURT: Do you write down phrases, or key words? Things of this nature?

THE WITNESS: Yes. Yes.

THE COURT: You say there may have been some direct quotes?

THE WITNESS: I believe. Now, I'm not sure, because I haven't—But I believe—Most of the time I try to, to at least put it in the children's words. Something to give the Prosecutors an idea of how the children relate the information.

■ In some parts, the reports contained a substantially verbatim, and contemporaneously made, recital of the victims' statements. The trial court erred in refusing to order the state to produce copies of those parts of the reports which contained the victims' substantially verbatim statements.

■ In reading the lengthy ruling by the trial court, it is apparent that its ruling was based mainly upon acceptance of the state's argument that the reports were the "work product" of the state and need not be disclosed. There simply is no "work product" exception for the production of witnesses' statements in Ark. Stat. Ann. § 43-2011.3(b) and (e). See *Goldberg* v. *United States*, 425 U.S. 94 (1976) and C. Wright, *Federal Practice and Procedure: Criminal 2d* § 437 (1982).

■ Even though the trial court erred in refusing to order the state to produce copies of the statements for appellant, reversal is not required for violation of the state statute if the error was harmless. *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984). Since the trial court allowed the appellant's counsel to examine the statements, and gain the full knowledge of their contents, violation of the production statute was harmless.

The appellant contends that even if the error was harmless under state law, it must be reversed under the Confrontation Clause of the Sixth Amendment, as applied to this State through the Due Process Clause of the Fourteenth Amendment. The argument is based upon the fact that, even though the trial court allowed appellant's counsel to view the reports, it expressly ruled that the appellant could not use the statements on cross-examination for impeachment purposes. In that part of its ruling, the court stated: "The main thing I want to put across is that you, you can't use Court's 1, 2, or 3 [the statements] for impeachment purposes."

■■ The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face

those who testify against him, and the right to conduct cross-examination. *Delaware* v. *Fensterer*, ___ U.S. ___, 106 S. Ct. 292 (1985) (per curiam). It is constitutional error to deny a defendant the right "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Pennsylvania* v. *Ritchie*, No. 85-1347, slip op. at 13 (United States Supreme Court Feb. 24, 1987) (Powell, J., plurality opinion), quoting *Davis* v. *Alaska*, 415 U.S. 308, at 318 (1974). Indeed, "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis*, 415 U.S. at 315-316. The Supreme Court has "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316-317. The reports in the case at bar contained prior statements by the witnesses which were in part inconsistent with their testimony at trial, and the trial court denied appellant the right of using the prior statements during cross-examination of the victims.

For example, the report of the interview with Damon Franklin reflects in part: "William [appellant] has also had anal intercourse with Adrian [one of the other victims], and Damon has seen this. He recalls once when they were all sleeping at William's house (Joyce Franklin was in William's bedroom), Damon saw William trying to get Adrian to 'suck' him, and then he performed anal intercourse on him."

However, at trial, Damon Franklin testified that he had never seen the appellant commit, or attempt to commit, any sexual crime upon Adrian.

In her statement, Kesia Franklin said that the appellant committed oral sex and painful anal intercourse upon her:

> William would wake Kesia up in the middle of the night and carry her into the bathroom. Sometimes he would wake her up by performing oral sex on her. Other times he would just pick her up. He would get a towel from the bathroom and place it on the floor in the hallway. He would then place Kesia on the towel face down, remove her clothing (sometimes she slept in street clothes—more often in a gown), and perform anal intercourse on her.

Kesia said both her bedroom door and her mother's bedroom door would be closed. When Kesia would cry or try to yell for help William would put his hand over her mouth. He also would threaten her—He said if she ever told anyone he would "do it again and then I'll get a gun and blow your head off."

William also bought Kesia clothes and candy to keep her from telling. She was afraid of him, and that kept her from telling. She didn't know if he would really get a gun, but he would often slap her, so she knew he would hurt her if he got mad.

Kesia denies vaginal intercourse. She said he would always put his "thing" in her "behind." This hurt, and sometimes she would bleed and have stomach cramps.

He usually performed oral sex on her before he took her into the hallway. She said she'd wake up and find his head between her legs.

Yet, her testimony at trial was only that the appellant attempted to have anal sex with her, but was unsuccessful.

The statement of Adrian Adams, in part, reflects: "William made Adrian perform oral sex on him only once that Adrian can remember." At trial, Adrian did not testify that appellant performed oral sex upon him.

██ The quoted parts of the prior statements are inconsistent with part of the trial testimony, but the trial court, by direct restriction on the right of cross-examination, prevented appellant's counsel from using the statements for impeachment purposes. Of course, the right of cross-examination includes the right to show that testimony is unbelievable, or that the witness could not remember events crucial to the testimony. *United States* v. *Abel*, 469 U.S. 45, 50 (1984). Because this type of evidence can at times make the difference between conviction and acquittal, the Supreme Court has found that this type of direct restriction on cross-examination violates the Confrontation Clause. *Davis* v. *Alaska*, 415 U.S. 308 (1974). Until recently, such a direct restriction on cross-examination was not subject to the harmless error rule, but instead required automatic reversal since it denied the defendant "the right of effective cross-examination which

'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart* v. *Janis*, 384 U.S. 1, 3." *Davis* v. *Alaska*, 415 U.S. 308, at 318 (1974) quoting *Smith* v. *Illinois*, 390 U.S. 129, 131. This language was repeated in *United States* v. *Bagley*, 473 U.S. 667, at 677 (1985). Then, in 1986, the Court, although not expressly overruling *Davis, supra*, wrote:

> Read properly, however, *Davis* does not support an automatic reversal rule, and the above-quoted language merely reflects the view that on the facts of that case the trial court's error had done "serious damage" to the petitioner's defense.

*Delaware* v. *Van Arsdall*, ___ U.S. ___, 106 S. Ct. 1431 at 1437 (1986).

The Court then explained the standard for analyzing cases such as the one at bar:

> Accordingly, we hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was *harmless beyond a reasonable doubt*. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. Cf. *Harrington*, 395 U.S., at 254, 89 S. Ct. at 1728; *Schneble* v. *Florida*, 405 U.S., at 432, 92 S. Ct., at 1059.

(Emphasis supplied.)

Here, the state could not make its case without the testimony of the victims. Their credibility was the key factor in the determinations of guilt. Yet, the trial court, by ruling that

appellant's attorney was prohibited from using the prior inconsistent statements for impeachment purposes, prevented appellant from questioning the witnesses' credibility. Accordingly, we cannot say the error was harmless beyond a reasonable doubt.

Appellant asks us to reverse and dismiss, rather than reverse and remand because, he argues, the evidence was not sufficient to support the three convictions. We reject the argument and remand for a new trial. The uncorroborated testimony of the minor victims was sufficient evidence to have sustained the convictions. *Sanders* v. *State*, 277 Ark. 159, 639 S.W.2d 733 (1982).

Reversed and remanded for a new trial.

HICKMAN and GLAZE, JJ., dissent.

DARRELL HICKMAN, Justice, dissenting. I would affirm the convictions in this case, because I find any error to have been harmless. The outcome would have been exactly the same, and it will be the same on a retrial. Indeed, if the prior statements are used, they will only buttress the state's case and convince the jury, even more so, that the defendant is guilty. Actually, the statements are more damning than the testimony presented at trial.

TOM GLAZE, dissenting. With due respect to the majority's analysis of the record, I strenuously disagree it supports reversal of this case. First, the trial court did not prohibit appellant's proper use of the three summaries of interviews obtained by Mary Parker from the children.[1] Second, Parker's handwritten summaries do not qualify as statements which the appellant could use for the unlimited cross-examination of the three children.

I will first consider appellant's claim that he was denied the proper use of Parker's summaries. The majority recites a remark made by the trial judge when ruling on appellant's request for Parker's summary interviews. At a rather lengthy hearing, the trial judge is quoted correctly as having said, "The main thing I want to put across is that you, you can't use Court's 1, 2 or 3 (the summaries) for impeachment purposes." The judge—if you put this remark in context with his other comments— was exactly

---

[1] Parker was the case coordinator of the state's Victim/Witness Assistance Unit.

right in his ruling. The judge perused Parker's interview of each child and said the handwritten summaries were narratives of opinions, conclusions and consolidations of thoughts that Parker put together involving the three children. Parker testified, "I didn't take actual statements"; nor did she tape the interviews. None of the interview summaries were signed or approved by the children.[2] In other words, those summaries simply do not qualify as statements under Ark. Stat. Ann. § 43-2011.3(b) and (e)(1) (Repl. 1977). That being so, appellant clearly was limited in his use of those actual summaries when cross-examining the children. Even so, the judge told appellant's counsel that he could ask about matters contained in the interviews. Of course, appellant would have been bound by the childrens' answers, and appellant's next course of action would be his examination of Parker, who was the actual authoress of those summaries.

In retrospect, it is easy to surmise, perhaps, that appellant should have been more exacting in stating how he intended to use the Parker summaries, and the judge could have been more precise in his ruling. Nonetheless, it is clear to me what the trial judge ruled in the instant case when discussing the appellant's use of the three summaries; it was not to preclude appellant's examination of the children—only the manner in which appellant went about it. Again, the only way to make this point clear is to set out the judge's entire ruling. Because of its length, I will take the privilege of highlighting those parts I believe support the judge's intention to allow appellant broad cross-examination of the children:

> The Court finds that these statements do not constitute *statements within the meaning of [11.3]* . . . And while they contain information that summarize faults given by this witness, and the other two prospective witnesses, that they're more in the nature of a work product of the Prosecuting Attorney's office. They do, in my opinion, contain exculpatory information. And while, to the view of some, might contain information on which a witness could

---

[2] For the reader to better understand the nature of the summaries, I attach to this dissenting opinion the shortest one which Parker made after her interview of Adrian. Although longer, the other two are the same style.

be cross examined, probably the only witness who could be cross examined is the person that wrote it. In other words, *I don't see how, Daemon, Adrian, or Kesia could be asked about statements that they made to another person about, did they say something that was different.* That is, for the purpose of impeachment, to show a prior inconsistent statement, that'd be. This—*the material's simply not phrased, or put so as to adopt that kind of use of this.* The Court also finds that the, the statements contain quite a bit more information than Kesia Franklin has testified on her direct examination. But the failure of the Prosecuting Attorney to inquire into those matters, which are not exculpatory by any means, doesn't make her statement any more available to the Defense for the purpose of impeachment, or any other use. The attorneys for the defendants have had the opportunity to view the statements. They object strongly to each and every ruling of the Court. They are admonished that, during their cross examination of any of these witnesses, that is, Kesia, Adrian, and Daemon, they are prohibited from referring to specific references. *However, they are permitted to inquire if they had made any statements to any kind of people.* If, if the witness was asked about different kind of things that they would ordinarily be entitled to inquire about during cross examination. I simply, because of the method that I chose to apprise the defendants of that which the State felt like that it couldn't—wouldn't be required to provide, to give them a leg up, so to speak, against any other witnesses. In other words, while you may have a pretty good frame of mind about what's contained in these statements, I don't think that you have gained such an appreciation of exact terminology that you could pose questions, and, and that kind of thing. *But I don't want to limit you in any way to the things that I think the testimony has already alluded to, and that common sense would permit. And that is, did you make a statement to anyone? Have you told anybody? This, that, and the other. Have you alleged that there was other abuse involved, especially whatnot? Now, that kind of thing, I think, would be permissible.* And the mere fact that something that you might inquire about may have been in this statement, you're not going to be prohibited

from inquiring about that simply because it's duplicated. The main thing I want to put across is that you, you can't use Court's 1, 2 or 3 for impeachment purposes. *But just because something appears in one of those statements doesn't mean you can't ask about it.* And now, maybe the next time I do something like this, I'll go about it a little differently. Because, it seems like, maybe I'm creating some problems for you. But I want you to be as aggressive as you feel like that you should be. *I don't want to limit your cross examination in any way. And I think that you probably maybe understand the spirit more than the words that I speak. And, and I would say this, that if you fault in any way, I would must prefer that you fault by asking a question that the State may object to as inappropriate. And if you do, the State will object, and I'll rule upon it. So you are not pinned in in any way from the latitude that you can go into, and the scope of cross examination.* Simply, you're not going to be able to, to use this to that, to that extent. Now, the, the jury has overheard us say something about a statement being provided to you. And then we came back here. I think we just ought to leave the matter where it is. That I don't need to say anything one way or the other about what was done in that regard. I find that the, the question, or the request by the Defense was quite appropriate. That it should have been requested under the statute. And that there's nothing sinister, inappropriate, or whatnot by anyone.

As can be seen from its ruling, the court suggested that the appellant cross-examine the children regarding Parker's summaries and allow the state to object when it deemed the appellant's questioning inappropriate. The court said it would then rule on the state's objection. Appellant made no attempt to follow the court's direction, and, instead, merely inquired of the children whether they had told Parker the truth, to which they said yes.

In sum, Parker's summaries did not qualify as statements under Ark. Stat. Ann. § 43-2011.3(b) and (e)(1) and (2) (Repl. 1977), and appellant was not entitled to the same use of those summaries as he would have had if they had been statements under that statute. Neither can I agree, from my view of the trial judge's ruling, that the court prohibited appellant's use of

Parker's summaries so as to violate appellant's rights under the confrontation clause of the United States or Arkansas Constitution. The case fails to rise to one of constitutional magnitude. The trial court merely found that the summaries were not statements, which I believe is justified by the reading of any one of Parker's three summaries.

The trial court allowed appellant to cross-examine the children, regarding the Parker summaries, but limited his actual use of those summaries, *viz.*, not allowing him their use when examining the children to show prior inconsistent statements made by them. In my view, that was a matter appellant was required to pursue with Parker, after having made inquiry of the subject matter with the children.

I cannot say the trial court abused its discretion in making its ruling, and I certainly cannot agree appellant's constitutional rights were violated by such ruling. I would affirm.

## Adrain Adams

Adrain is a 9th grader at Henderson Junior High School; he is 12 years old. Adrain's parents had an interracial marriage - his mother is white; his father is black. They are divorced now. Adrain lives with his mother, but he sees his father often.

Adrain gives the impression of being very "cool" - he says he is stronger than Damon and Kesia, but he still has a nice childlike quality about him that gives his true feelings away - he is very scared. His parents have been great about reassuring him that the sexual abuse was not his fault. This is very important to Adrain - he always adds that his parents say he's not into any trouble.

William started abusing Adrain when Patty Adams moved into the Franklin's house at 2805 W. 16th. It continued when Adrain and his mother moved next door to William.

William would usually call Adrain into the bedroom and take his clothes off. He would make Adrain get on the bed on his hands and knees. William, undressed, would have anal intercourse on Adrain.

William threatened Adrain with bodily harm if he told - he said he would break his arm and hurt somebody in his family. Adrain said sometimes he believed Williams.

Adrain p. 2

William made Adrain perform oral sex on him only once that Adrain can remember. He knows William performed oral sex many times.

Adrain said William made him and Damon have anal intercourse. He recalls seeing Damon have anal intercourse with Kesia and William.

Adrain said once Damon and Kesia saw him with William at the Franklin's house. They were in Joyce Franklin's bedroom, and he told Damon and Kesia to get out.

AP.