Anthony Wayne GRIFFIN *v.* STATE of Arkansas

CR 94-1105 909 S.W.2d 625

Supreme Court of Arkansas
Opinion delivered October 30, 1995
[Petition for rehearing denied December 4, 1995.]

208

*Donald A. Forrest*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y Gen., Senior Appellate Advocate, for appellee.

BRADLEY D. JESSON, Chief Justice. The appellant, Anthony Wayne Griffin, was charged and convicted of capital felony murder in Crittenden County Circuit Court and was sentenced to life imprisonment without parole. On appeal, he asserts seven points of error: (1) the trial court erred in failing to suppress statements Griffin made while in custody; (2) the trial court erred in refusing to grant his request for a continuance; (3) the overlapping between the capital murder and first-degree murder statutes allows the jury to make an unconstitutionally capricious choice of crime and punishment; (4) the trial court erred in refusing to give an instruction on second-degree murder; (5) the trial court erred in not granting a mistrial following a reference to crack cocaine; (6) the trial court erred in not granting a mistrial after mingling of jurors and witnesses; and (7) the trial court erred in failing to instruct the jury regarding the weight to be given to expert witnesses. We affirm.

## Facts

On May 31, 1993, the body of Moten Wynne was discovered in the back bedroom of his home in Lehi, Arkansas. Lying face down with his hands and feet bound together and his mouth gagged, Wynne had been struck several times in the back of the head, apparently with an axe which was found nearby.

During custodial interrogation at the Clarksville, Tennessee Police Department, appellant Anthony Griffin confessed to the murder as follows. In late May of 1993, Griffin was working as an automobile mechanic for Willie Smith in Clarksville when he pocketed $500.00 that he had collected from one of Mr. Smith's customers. He left with the money and headed west, arriving in West Memphis just before Memorial Day. While in the area, he saw the victim working on an automobile in the front yard of his

home. Griffin helped Wynne repair the car, and Wynne gave Griffin two dollars and some cigarettes. Wynne flagged down a friend, and asked him to give Griffin a ride down to nearby Blue Lake. At the destination, Griffin did not have the $3.00 admission fee for Blue Lake, and hitchhiked back to Wynne's house.

After Griffin and Wynne visited for approximately thirty minutes to one hour, Wynne announced that he had to get ready to go into town to eat. Griffin then hit the victim, making him lie down on the floor so that he could tie his hands and feet together. After dragging the victim to the back bedroom, Griffin "hog-tied" him, gagged him, and placed a blue blanket over his head. Griffin then searched the house and found two pistols, a shotgun, and a box of tools, all of which he loaded into Wynne's automobile. Fearing that the victim might be able to get away, Griffin reentered the house, tore the phone off the wall, and hit Wynne in the head some five or six times with a hatchet. Griffin then left in Wynne's car, later selling it in Nashville, Tennessee. Griffin likewise sold the three guns and the box of tools, while returning to Clarksville.

Griffin was charged by felony information in Crittenden County with capital felony murder. The State waived the death penalty. Over Griffin's objection, the trial court admitted his four in-custodial statements to police, and a fifth statement given to Willie Smith by telephone. At the close of all the evidence, the jury returned a verdict finding Griffin guilty of capital felony murder. The trial court entered a judgment of conviction for capital felony murder and sentenced Griffin to life imprisonment without parole, from which he now appeals.

## I. Admission of custodial statements

Appellant Griffin's first allegation of error is that the trial court erred in denying his motion to suppress his four in-custodial statements to police, as well as a statement given to Willie Smith. While the record does not contain a written motion to suppress these statements, the trial court was evidently aware of Griffin's objection to the admission of the statements, as it held an evidentiary *Denno* hearing on this issue in accordance with *Jackson* v. *Denno*, 378 U.S. 368 (1964), after which it declined to suppress Griffin's statements.

At the hearing, Detective Marty Watson of the Clarksville, Tennessee Police Department testified that he was investigating Griffin on forgery charges and learned on June 14, 1993, that Griffin was in jail and wanted to talk to someone about the forgery case. At approximately 11:45 a.m. that day, Detective Watson went to the jail, read Griffin his rights, and had him sign a waiver-of-rights form. According to Detective Watson, Griffin told him that he would tell him everything he wanted to know, and "stuff" that he did not know, if Detective Watson would permit him to smoke a cigarette. Detective Watson advised Griffin of the building's "no smoking" policy, but Griffin would not talk to him without the cigarette, Detective Watson, for the purposes of his own notes, then wrote "refused" on the rights form. It was Detective Watson's testimony that Griffin specifically told him that he was "not refusing it"; rather, Griffin stated he "just want[ed] a cigarette." The officer returned to his office and related the situation to his sergeant, who advised him to check Griffin out of the jail and allow him to smoke a cigarette outside on the way to the interview room.

At approximately 2:00 p.m., while proceeding under the original waiver-of-rights form, Detective Watson interviewed Griffin, who gave him information about the forgeries as well as other crimes he had committed. During this interrogation, Detective Watson scratched out the "refused" notation on the rights form and signed his name beside the scratch-out. When Detective Watson asked Griffin if there was anything else he wanted to tell him, Griffin replied, "I don't know how to tell you this, but I killed a man in West Memphis, Arkansas." Griffin offered to draw a map to the victim's house, and while doing so, Detective Watson left the room to get Detective Erin Kellett and to have someone contact West Memphis authorities to confirm Griffin's story.

Detective Kellett testified that he entered the interview room and witnessed and signed the original rights form, noting that the time was 2:00 p.m. rather than 11:45 a.m. He also witnessed and signed a second rights form before taking both a written and a taped statement from Griffin. In each statement, Griffin confessed to committing the murder.

Detective R.W. Brockwell of the Crittenden County Sher-

iff's Office testified that he arrived the next day, June 15, 1993, and interviewed Griffin at the Clarksville Police Department. After Brockwell read Griffin his rights, Griffin signed and initialed a waiver-of-rights form. Griffin then made both taped and written statements, in which he again confessed to the murder. Detective Brockwell, as well as Detectives Watson and Kellett, denied using any threats, force, or coercion to obtain the statements from Griffin.

Willie Smith testified that on June 15, 1993, Griffin's sister, Mary Garrard, came by his place of business to tell him that Griffin wanted to talk to him. Later that afternoon, Mr. Smith went by Griffin's mother's residence, where he talked to Griffin on the telephone. According to Mr. Smith, Griffin confessed to him that he had committed the murder.

Griffin testified at the *Denno* hearing and denied that he had made any statements to police on June 14. According to Griffin, he told the Tennessee officers that he wanted to talk to someone about a murder that happened in Arkansas, but refused to make a statement until the Arkansas detectives arrived the next day. Griffin stated that on June 15, before his rights were read to him, Detectives Brockwell and Watkins took him outside to the top of the building so that the three could smoke cigarettes. According to Griffin, Detective Brockwell handed him a cigarette, then hit him in the head with a pistol. Griffin testified that Detective Brockwell threatened that if he did not say what he was told to say, he would push him off the side of the roof, then "give his family's address to the victim's family to come and kill them." Griffin stated that he was then "carried" back downstairs where he was forced to give both a written and a taped statement. It was Griffin's testimony that during his taped statement, Detective Brockwell hit him on at least two occasions, which explained "[a] whole bunch of pauses in the tape."

Griffin claimed that, after giving statements to the officers, he was carried back down to the drunk tank, where he told either Jailer Anderson or Jailer Monzella, neither of whom was present during his statements to police, that his head was bleeding and that he needed to go to the hospital. According to Griffin, one of the jailers brought him an ice pack. Griffin also denied telling Willie Smith that he had committed the murder; rather, he con-

tended that he merely told Mr. Smith that officers "had me for a murder case." Griffin's counsel proffered this testimony at the hearing. However, when asked by the trial court if the jailers could testify as to the nature and extent of the injuries Griffin had allegedly received, counsel replied that he was "not sure." After oral arguments, the trial court denied the motion to suppress the five statements, finding that, by a preponderance of the evidence and under the totality of the circumstances, the statements were "voluntarily, knowingly, understandably and intelligently given," and that Griffin had "voluntarily, knowingly, and intelligently waived his 5th and 6th Amendment Rights."

In *Smith* v. *State*, 254 Ark. 538, 494 S.W.2d 489 (1973), we adopted the rule that, whenever an accused offers testimony that his confession was induced by violence, threats, coercion or offers of reward, the State has the burden to produce all material witnesses *who were connected* with the controverted confession or give an adequate explanation of their absence.[1] (Emphasis added.) As we recently recognized in *Foreman* v. *State*, 321 Ark. 167, 901 S.W.2d 802 (1995), we have repeated this rule many times. *Remeta* v. *State*, 300 Ark. 92, 777 S.W.2d 833 (1989); *Williams* v. *State*, 278 Ark. 9, 642 S.W.2d 887 (1982); *Earl* v. *State*, 272 Ark. 5, 612 S.W.2d 98 (1981); *Bushong* v. *State*, 267 Ark. 113, 589 S.W.2d 559 (1979), cert. denied, 446 U.S. 938 (1980); *Gammel & Spann* v. *State*, 259 Ark. 96, 531 S.W.2d 474 (1976); *Russey* v. *State*, 257 Ark. 570, 519 S.W.2d 751 (1975); *Northern* v. *State*, 257 Ark. 549, 518 S.W.2d 482 (1975); *Smith* v. *State*, 256 Ark. 67, 505 S.W.2d 504 (1974).

In *Bushong* v. *State, supra,* we held that a constable who was present at the scene of Bushong's arrest was not a material witness. In so holding, we stated as follows:

---

[1] In adopting the material witness rule in *Smith*, we were persuaded by the Illinois Supreme Court's position in *People* v. *Armstrong*, 282 N.E.2d 712 (1972). One distinguished member of this court questioned the propriety of the *Smith* rule soon after its adoption. *Smith* v. *State*, 256 Ark. 67, 505 S.W.2d 504 (1974)(Smith, J., dissenting). Subsequently, in *Bushong* v. *State*, 267 Ark. 113, 589 S.W.2d 559 (1979), *cert. denied*, 446 U.S. 938 (1980), we noted the Illinois Supreme Court's extensive experience with this rule, and discussed six Illinois cases. In *People* v. *R.D.*, 155 Ill.2d 122, 613 N.E.2d 706 (1993), the Illinois Supreme Court, noting that only a minority of states including Arkansas still followed it, repudiated the material witness rule entirely. In this case, the State has not asked us to repudiate the *Smith* rule, and we are not inclined to do so at this time.

> If we decide that he was a material witness, then we might as well say all witnesses who could possibly have witnessed anything must be called by the State. That is an unreasonable burden to place upon the State. *There must be some connection between the alleged acts of coercion or an opportunity to observe the alleged coercion.* This record gives no indication that [the constable] would have been a material witness in any regard except he happened to be present on the scene and might have observed something.

267 Ark. at 121. (Emphasis added.) We cannot conclude that the State was required to produce the jailers. There was no connection between them and the alleged acts of coercion, and they were not in a position to observe the alleged coercion.

While the record indicates that Griffin was given notice of his April 11, 1994, trial date on March 17, 1994, it is significant that Griffin did not enlist the aid of the prosecutor to obtain the presence of Anderson and Monzella until Friday, April 8, 1994, at approximately 4:00 p.m. Upon receiving the faxed subpoenas, the jailers' supervisor related that he could not release them from work on such short notice. While the State never subpoenaed the jailers, the prosecutor explained at the *Denno* hearing that he "ha[d] no idea who the officers are, or anything."

In deciding the issue of voluntariness in the absence of testimony from Anderson and Monzella, who were not present during the alleged coercive acts, the trial court was permitted to consider both Griffin's eleventh-hour attempt to subpoena these witnesses, and counsel for Griffin's concession at the hearing that he was "not sure" whether either officer could testify as to the nature and extent of injuries Griffin had allegedly received. Moreover, in making his decision, the trial judge, who was in the best position to assess the credibility of the witnesses, *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994), apparently concluded that the State's witnesses were more credible than Griffin's. In short, in examining the record before us, we conclude that the trial court did not abuse its discretion in failing to require the State to produce the two jailers, nor did it err in refusing to suppress Griffin's statements.

Griffin also asserts that he was only read his *Miranda*

rights in relation to the forgery charges against him in Tennessee, and was not Mirandized with respect to the homicide. We have previously addressed this issue in *Whitmore* v. *State*, 296 Ark. 308, 756 S.W.2d 890 (1988), as follows:

> It is not a violation of the rather rigid *Miranda* rules for the police to give one valid warning and then question the suspect about two or more different crimes. *Hall* v. *State*, 242 Ark. 201, 412 S.W.2d 603 (1967). Further, and distinguished from the argued police violation of the *Miranda* rules, a suspect's awareness of all of the different charges in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege. *Colorado* v. *Spring*, 479 U.S. 564 (1987).

In contrast, the case cited by Griffin on this point, *Shelton* v. *State*, 287 Ark. 322, 699 S.W.2d 728 (1985), involved the issue of whether the statement Shelton gave an officer in his police car was the result of custodial interrogation, and, thus, required *Miranda* warnings. Here, the Tennessee officers gave Griffin a valid *Miranda* warning prior to questioning him about the forgery charges. The subject of the homicide arose after Detective Watson asked Griffin if there was anything else Griffin wanted to tell him. Under these circumstances, there was no violation.

## II. Motion for continuance

For his second allegation of error, Griffin maintains that the trial court erred in denying his motion for continuance. At trial, Griffin requested a continuance in order to obtain the presence of three potential witnesses who had been subpoenaed for trial, but who had not honored the subpoenas. The absence of two of the three witnesses, Officers Anderson and Monzella of the Clarksville, Tennessee Police Department, was addressed in the first point above. The third witness, Jerry Parsons, was "the blond-haired guy" Griffin claimed actually murdered Mr. Wynne.

A motion for a continuance is addressed to the sound discretion of the trial court, and the court's decision will not be reversed absent an abuse of discretion. *Hill* v. *State*, 321 Ark. 354, 902 S.W.2d 229 (1995). Ark. Code Ann. § 16-63-402(a)(1987) requires that, once the party opposing the motion

for continuance has objected to the motion, the moving party must submit an affidavit to justify a continuance:

> A motion to postpone a trial on account of the absence of evidence shall, if required by the opposite party, be made upon affidavit showing the materiality of the evidence expected to be obtained and that due diligence has been used to obtain it.

*See also Id.* at 357. The State objected to the continuance at trial, and Griffin filed no affidavits in support of his motion. A trial court does not abuse its discretion in denying a request for continuance when the motion is not in substantial compliance with Ark. Code Ann. § 16-63-402(a). *Id.* Accordingly, we find no error on this point.

### III. Overlap of offenses

Griffin next argues that the overlapping between the capital murder statute and the first-degree murder statute allows the jury to make an unconstitutionally capricious choice of crime and punishment, and that the phrase "circumstances manifesting extreme indifference to the value of human life" is so vague that it violates his right to equal protection of the law. The State is correct in its assertion that Griffin made no objection to either the capital felony murder or the first-degree murder instruction, and, thus, his argument is not preserved for our review. *Nichols v. State*, 306 Ark. 417, 422, 815 S.W.2d 382, 385 (1991).

### IV. Instruction on second-degree murder

Griffin's fourth point on appeal is that the trial court erred in refusing his request to instruct the jury with the definition of second-degree murder. See AMI Crim. 2d 1003. While the record reflects that Griffin did in fact request that the second-degree murder instruction be given to the jury, it is true, as the State argues, that a copy of this instruction does not appear in the record. It is the appellant's duty to bring up a record sufficient to show that the trial court committed error. *Claiborne* v. *State*, 319 Ark. 537, 892 S.W.2d 511 (1995); *Stewart* v. *State*, 316 Ark. 153, 870 S.W.2d 752 (1994). Because Griffin did not proffer the instruction on second-degree murder into the record, his argument that the trial court erred in refusing to so instruct the jury is not preserved for our review.

## V. Motion for mistrial — prior bad acts

Griffin's next allegation of error is that the trial court should have granted his motion for mistrial after a State's witness, Crittenden County Officer R.W. Brockwell, read into evidence Griffin's June 15, 1993 handwritten in-custodial statement, which included the following sentence, "I left work with the money and went to Lincoln Homes to buy crack cocaine, Tuesday, 5/25/93."

A mistrial is an extreme remedy that should only be granted when justice cannot be served by continuing the trial. *Richmond* v. *State*, 320 Ark. 566, 899 S.W.2d 64 (1995). We will not reverse a trial court's decision to deny a motion for mistrial except for an abuse of discretion or manifest prejudice to the complaining party. *Brown* v. *State*, 320 Ark. 201, 895 S.W.2d 909 (1995).

Prior to opening statements, the trial court ruled, at Griffin's request, that the State's witnesses testifying about the circumstances of Griffin's in-custodial statements were not to mention the specific criminal charges pending against Griffin in Tennessee. However, Griffin made no specific objection to the allusion to crack cocaine purchase in his in-custodial statement until it was read at trial. The trial court denied the motion for mistrial, ruling that it was untimely. However, the court offered both to caution the jury to disregard the reference to cocaine use, and to allow counsel to mark out the reference in the statement. While Griffin accepted the trial court's offer, no such cautionary instruction was given to the jury. It was Griffin's duty, as the moving party, to see that the trial court gave the cautionary instruction. *Logan* v. *State*, 299 Ark. 255, 773 S.W.2d 419 (1989).

It is also significant that Griffin suffered no prejudice by the reference to his crack cocaine purchase. During Griffin's case-in-chief, he testified on direct examination that, on the day he was arrested, he had visited a "dope house" and had smoked crack cocaine. We have said many times that evidence that is merely cumulative of other evidence admitted without objection is not prejudicial. *Landrum* v. *State*, 320 Ark. 81, 894 S.W.2d 933 (1995). Under these circumstances, we conclude that the trial court did not abuse its discretion in denying the motion for mistrial.

## VI. Motion for mistrial — juror contact with victim's family

Griffin further alleges that the trial court erred in denying his motion for mistrial on the basis of improper contact during the trial between jurors and members of the victim's family. During a recess at trial, juror Clayton and alternate juror Marconi were seen in a lounge where members of Mr. Wynne's family were drinking coffee and talking. Griffin made a motion for mistrial claiming improper contact. The trial court denied the motion, and admonished the jury not to have contact with any of the parties, witnesses, or attorneys. The trial court asked the jurors if any of them had had a conversation with members of the victim's family or any other witnesses and none responded in the affirmative. At the close of all the evidence, the trial court held a hearing relating to Griffin's motion. Alternate juror Marconi testified that she and juror Clayton had discussed "speech therapy" in the attorney's lounge while getting coffee. She denied having had any conversation with members of Mr. Wynne's family, stating that she did not notice whether they were in the same room. Bailiff Boswell also testified at the hearing, stating that the jurors spoke with one another in the lounge and did not talk to any witnesses.

In *Hutcherson* v. *State*, 262 Ark. 535, 558 S.W.2d 156 (1977), the appellant moved for a mistrial after it was learned that the father of a murdered policeman had talked to one or more members of the jury during a recess. The trial court called the father to the witness stand, and was satisfied by his answers that nothing had been said which would prejudice a juror. We found no abuse of discretion in the trial court's decision to deny the motion for mistrial, holding that such a meeting alone was not prejudicial error. As we stated in *Dillard* v. *State*, 313 Ark. 439, 855 S.W.2d 909 (1993), it is Griffin's burden to demonstrate that a reasonable possibility of prejudice resulted from the contact. On the facts before us, it cannot be said that the trial court erred in denying Griffin's motion for mistrial.

## VII. Instruction — expert witness

For his final point of error, Griffin claims that the trial court erred in failing to instruct the jury concerning the weight to be given to the testimony of the State's expert witness, State Medical Examiner Dr. William Sturner, who performed the

autopsy on the victim. Specifically, Griffin maintains that the trial court should have instructed the jury that it was not bound to accept Dr. Sturner's testimony as conclusive. However, Griffin neither requested a special instruction on this point, nor did he proffer any such instruction to the trial court; therefore, the State is correct in its assertion that we cannot address the merits of his argument on appeal. *Brown* v. *State, supra.*

### VIII. Compliance with Ark. Sup. Ct. R. 4-3(h)

Because Griffin received a sentence of life imprisonment without the possibility of parole, we must review all prejudicial erroneous rulings adverse to him pursuant to Ark. Sup. Ct. R. 4-3(h). While neither Griffin nor the State briefed Griffin's objection to the admission of hearsay testimony at trial, we believe that it is necessary to discuss this issue.

During Griffin's case, his counsel called Investigator Mike Morgan of the Crittenden County Public Defender's Office as a witness, and inquired as to whether he had obtained any information regarding a "second suspect" in the case. Morgan replied that he had attempted to locate a "blond-headed guy" identified as Jerry Parsons, but had learned from a neighbor to Parsons's mother in Memphis, Tennessee, that Parsons, a transient, currently lived in California. According to Morgan, he turned this information over to the Crittenden County Sheriff's Department, which located Parsons in Gulfport, Mississippi, approximately two weeks prior to trial. When asked by Griffin if anyone had talked to Parsons, Morgan responded that it was his understanding that the sheriff's department had talked to Parsons on the telephone, and that Parsons had denied having any involvement in the homicide.

On rebuttal, the State called Investigator Brockwell to the stand, and the following exchange took place:

> PROSECUTOR: All right and what did Jerry Parsons tell you?

> COUNSEL FOR GRIFFIN: Your Honor, I object. That's nothing but rank hearsay. If Jerry Parsons wanted to testify, or they wanted to get him to testify, they should have had him here. That's hearsay.

PROSECUTOR: Your Honor, I agree it's hearsay, but they wanted to know. And I put the officer on the stand.

THE COURT: I'm going to overrule the objection.

PROSECUTOR: What did he tell you?

WITNESS: He said that in May of 1993 he was hitchhiking through Arkansas; he was picked up by a white male close to Memphis, is what he said; that he gave the man five ($5) dollars for gas, uh, they stopped at a truck stop, he said somewhere near West Memphis to sell some tools; that he had this individual drop him off in Memphis at his mother's residence and that's all he knew.

The State apparently elicited Brockwell's testimony in response to Griffin's inquiry of Morgan as to whether he had obtained any information on a "second suspect." In a sense, when Morgan testified as to his attempts to locate a "blond-headed guy" identified as Jerry Parsons, Griffin opened the door to this line of questioning. In any event, as the prosecutor conceded, Investigator Brockwell's testimony admitted here was hearsay. Arkansas Rule of Evidence 801(c) defines hearsay as follows:

a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Furthermore, A.R.E. 802 provides that hearsay statements are inadmissible, unless the statements fall under an exception provided by law or the rules of evidence. None of the exceptions to the hearsay rule apply in this instance.

 We have recognized that, under the Sixth Amendment Confrontation Clause, the State must usually either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. *Killcrease* v. *State*, 310 Ark. 392, 836 S.W.2d 380 (1992), *citing Idaho* v. *Wright*, 497 U.S. 805 (1990) and *Smith* v. *State*, 303 Ark. 524, 798 S.W.2d 94 (1990). Yet trial error, even involving the Confrontation Clause, is subject to harmless error analysis. *Gatlin* v. *State*, 320 Ark. 120, 895 S.W.2d 526 (1995), *citing Watson* v. *State*, 318 Ark. 603, 887 S.W.2d 518 (1994) (*citing Delaware* v.

*Van Arsdale,* 475 U.S.673 (1986) and *Winfrey* v. *State,* 293 Ark. 342, 738 S.W.2d 391 (1987)). Griffin did not raise any constitutional objection to the admission of the hearsay statement, either below or on appeal, and has thus waived any constitutional argument. *Gatlin* v. *State, supra; citing Killcrease* v. *State, supra.* Therefore, we will not analyze the admission of the hearsay testimony under the constitutional standard of harmless beyond a reasonable doubt. *Gatlin* v. *State, supra, citing Greene* v. *State,* 317 Ark. 350, 878 S.W.2d 384 (1994).

It was Griffin's burden to produce a record that demonstrates he was prejudiced by the admission of the hearsay testimony, as we do not reverse for harmless error. *Gatlin* v. *State, supra, citing Berna* v. *State,* 282 Ark. 563, 670 S.W.2d 434 (1984), *cert. denied,* 470 U.S. 1085 (1985), and *Wilson* v. *State,* 317 Ark. 548, 878 S.W.2d 755 (1994). As the jury was permitted to consider five statements in which Griffin admitted to committing the murder, we cannot conclude that Griffin has overcome his burden of showing that he was prejudiced by the admission of the hearsay testimony.

Finding no erroneous rulings adverse to Griffin that cause reversal, we affirm the decision of the trial court.

GLAZE and ROAF, JJ., concur.

TOM GLAZE, Associate Justice, concurring. I concur on the majority opinion's point one regarding the trial court's admission of Anthony Griffin's custodial statements. In sum, I submit it is unnecessary to affirm solely upon whether the trial court was correct in admitting Griffin's controverted confessions he claims were coerced from him on June 15, 1993. The record clearly reflects and the trial court so found that Griffin gave officers two confessions on June 14, 1993, which were almost identical to the ones he claimed were coerced from him on June 15. Although Griffin at the *Denno* hearing denied he gave any statements on June 14, all of the evidence reflects otherwise. Griffin signed and initialed his *Miranda* rights dated June 14, 1993, and the authorities took both a written *and* taped statement from Griffin on the same date. On June 14, Griffin also drew a map of where his victim's house was located. In addition, Griffin's employer, Willie Smith, testified Griffin confessed to him when Smith spoke by telephone to Griffin on June 15.

In *Arizona* v. *Fulminante*, 499 U.S. 279 (1991), the Supreme Court held that a trial court's admission of an involuntary confession is subject to harmless error review on appeal. In allowing for harmless error review where an involuntary confession is in issue, the *Fulminante* court cautioned that a confession is the most probative and damaging evidence that can be admitted against a defendant, and, if it is a full confession, a jury may be tempted to rely on it alone in reaching its decision. Nonetheless, an error is harmless if that confession was "unimportant in relation to everything else the jury considered on the issue in question as revealed in the record." *Yates* v. *Evatt*, 500 U.S. 391 (1991); *see also U.S.* v. *Jones*, 16 F.3rd 275 (8th Cir. 1994).

In the present case, the record shows beyond a reasonable doubt that the jury would have convicted Griffin even absent his June 15 confessions. As alluded to above, Griffin gave three other confessions, admitting his having murdered the victim. One of these statements given on June 14 went into enormous detail. In that statement, he related the events leading up to seeing a man working on a vehicle, helping the man and later tying up the man and stealing the man's guns, car and tools. Griffin left in the man's car, but returned to kill the man. He also identified his victim's house as the one he broke into. Other than his empty denial of making no statements on June 14, Griffin offered no evidence to contradict his June 14 signed rights form, written and taped statements, and his drawn map describing where his victim lived.

Whether Griffin's June 15 statements were erroneously admitted into evidence is of no import, since the record bears evidence showing Griffin's guilt beyond a reasonable doubt. In my view, the majority court's discussion of whether the state withheld the names of material witnesses who may, or may not, have observed the taking of his June 15 statements unnecessarily complicates this point on review. Thus, I would affirm this suppression issue based upon harmless error.

ROAF, J., joins this concurrence.