

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR–15–555

| | |
|---|---|
| | **Opinion Delivered** January 27, 2016 |
| ARICK JOHNSON<br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTH DIVISION |
| V. | [NO. 60CR–13–2738] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE HERBERT WRIGHT, JUDGE |
| | AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Arick Johnson was convicted of terroristic threatening in the first degree in a bench trial held on February 9, 2015. He appeals his conviction, arguing that the trial court erred in excluding evidence that the alleged victim and her husband were biased and had motive to lie. We affirm.

At the trial, Karen King, general manger of the Otter Creek Homeowners Association, testified that she was contacted by Julia Pike Holley on May 27, 2013, and asked to retrieve a copy of the video surveillance from that day. King stated that a Hummer was seen coming through the entrance of Otter Creek at 12:35:09. However, she stated that she did not know where the vehicle went when it came into Otter Creek. She also said that she did not know whether the driver of that vehicle threatened anyone.

Julia testified that she was outside her home on the date in question while her young children were riding their bikes. She stated that she remembered a Hummer coming onto her street with the "music really loud and aggressive." She said that she immediately told her son to get out of the road and went towards her daughter to get her out of the street. According to Julia, a female passenger in the Hummer began yelling obscenities to her. She testified that the driver of the Hummer,[1] whom she later identified as appellant, came right beside her and said, "I'll kill you, bitch." Additionally, she stated that appellant held up his hand and said, "boom, boom." Julia said that she then tried to make contact with her husband, Isaac "Ben" Holley, who was in State Trooper school at the time. She stated that she waited to hear back from Ben, and that after she informed him of the situation and described the driver, Ben told her to call the police and file a report immediately. Julia stated that she was 100% sure that appellant was the person who threatened to kill her.

On cross-examination, Julia stated that she did not inform the police of appellant's name until June 5, 2013. She stated that she had never seen appellant before May 27th. She acknowledged that she did not contact the police until approximately five hours later. She stated that when she described the person to Ben, he stated that he believed that he knew who she was talking about and told her to call the police. She said that it was Ben who told her appellant's name. She testified that she had never heard appellant's name before that time. However, she acknowledged that Ben had mentioned an "individual in the apartment

---

[1]The parties stipulated that appellant drove a yellow Hummer during this time frame.

SLIP OPINION

complex he'd had issues with, so immediately after, Arick Johnson was removed from the apartment complex." She said the day following appellant's removal, the back window of Ben's truck was busted out. She said that "just recently my husband told me that [Arick's] girlfriend had called state police and said something about my husband went to their apartment and threatened them." She denied having any knowledge about complaints filed by appellant against Ben.

Ben testified that he was employed by the Arkansas State Police. He stated that he was also employed by the State Police at the time of the incident. He said that he was hired in October 2012 as a security guard for an apartment complex in which appellant lived. He stated that he was informed that appellant was suspected of illegal activity and was asked to keep an eye on appellant. During Ben's testimony, the State made an objection to relevance:

STATE: The State was allowing some leeway of because I believe it does establish motive of this defendant to commit this crime. At this point the State would object to relevance as the line of questioning.

COURT: Relevance?

DEFENSE: Your Honor, first of all, it's relevant because it establishes he's a liar. Second of all, it goes toward—the whole thing is bias toward my client.

COURT: But at this point he hasn't testified that your client has said or done anything in relation to the charges that we've got here before us. So, gain, you may have impeached him. If I take it, take you at your word that he's lied about something, that's fine. What is the relevance of his being truthful have to do with this charge?

DEFENSE: Because it was, it's as his wife testified he was the one who told her that it was Arick Johnson.

COURT: I'll give you that. And if that's your only relevance, then you need to move on. She identified this man as the person that she saw there. So

whether or not he told her who it was, again, does not have any bearing on this particular charge. So you need to move on.

Ben testified that his first incident with appellant took place shortly after Ben began working at the apartment complex. After which, the following took place:

DEFENSE: Okay, now what can you tell us how it came to be that you threatened to mistake Arick Johnson's phone for a gun—

STATE: Objection.

DEFENSE: -- and kill him?

STATE: This is well beyond anything that's relevant to the charges.

COURT: Sustained.

DEFENSE: Your Honor, this is absolutely necessary to show his bias and motive to get my client convicted.

COURT: Well, and I grant you, you could prove that he's biased against your client. At this point, you haven't given—there's no evidence before me that he has accused your client of saying or doing anything. I have the testimony of Mrs. Holley saying what happened and identifying your client. So, you can prove he's biased all day long. I'll give you that, but I don't see the bearing.

DEFENSE: Okay.

Ben stated that he spoke to his wife on May 27, 2013, about someone threatening her. He said that he told her that he believed the person was appellant. However, Ben denied telling Julia to make false accusations against appellant.

The defense continued to ask Ben questions that were challenged for relevance. The court cautioned the defense that it had failed to provide any proof that Ben had gotten Julia to falsely testify to something. The court stated that the defense was "loading up on proof of

that he had a motive to do that, but without proof that he did it, where does that leave us?"

The court subsequently allowed the defense to make its proffer.

DEFENSE:     Okay, Your Honor, I would proffer that Trooper Holley told my client and told Detective Everett the same that he, that he was going to, that Arick Johnson approached him with a phone recording him on the night of their first incident.

In doing so, Trooper Holley said the words, "I could mistake that phone for a weapon and kill you." At which time Mr. Johnson replied, "Are you threatening to kill me like Travon Martin?" And he said, "No, I'm not a security guard. I'm a police officer." Okay? And then he stated, "Are you threatening to shoot me?" And Trooper Holley left the scene.

I also would proffer at this time the fact that Trooper Holley made a false police report against Mr. Johnson stating that he smelled weed from across the complex, yet Mr. Johnson was never arrested. The police, in fact, never came into Mr. Johnson's residence based on any smell of marijuana.

I would also proffer that Trooper Holley would testify that he had told his wife that on Halloween night, when someone threw a rock through their truck window that they believed it was Arick Johnson, but they didn't have proof. You[r] Honor, I believe that is all I have.

Detective Angela Everett of the Little Rock Police Department testified that she was assigned to the incident that took place on May 27, 2013. She said that Julia did not give her appellant's name initially, and that it was after Julia spoke with Ben that they provided her with appellant's name. She said that Ben gave her a "more extended version of the events."

The court then allowed the defense to proffer that Ben told Detective Everett something "relating to mistaking the [appellant's] phone for a weapon and killing him."

Appellant testified that he never threatened to kill Julia and that he never had any problems with her before the case started. He acknowledged that he did, however, have

problems with Ben, which started when Ben began working as the security guard at the apartment complex in which appellant lived. Appellant denied ever threatening Ben or damaging any of Ben's property. He testified that he had filed several reports on Ben with several agencies to no avail. Appellant stated that he had numerous videos of Ben threatening to shoot him, but that the evidence was taken when his residence was searched pursuant to a search warrant. He admitted that he went inside the gate in Otter Creek on May 27, 2013, but he denied threatening Julia.

On cross-examination, appellant stated that he was familiar with where the Holleys lived because it was directly behind the apartment complex where he used to live. He testified that he disliked Ben because Ben threatened to release his dog on appellant and his son. Appellant said that he "tried to take every appropriate action in every way [he] could to submit that [Ben] is not mentally capable of being in that position. He could easily mistake someone for having a gun for their phone." Appellant stated that he posted pictures of the Holleys' house on Facebook after he was notified that they had made complaints against him. He also admitted to posting, "This bitch said he was going to shoot me when he had a badge on. He didn't even know him and his precious family is on Goblin Watch for his lack of reality. That badge ain't shit on this field."

The State moved to introduce the Facebook post. At that point, the defense argued that the State had opened the door "to all other issues based on the fact that he's getting into the threats between the two of them." The State contended that the evidence was introduced to show appellant's knowledge of where the Holleys lived. The court ruled that the door had

not been opened, and it denied the defense's request to go into the evidence that had been proffered.

On redirect, appellant testified that Ben had originally told him, "Your precious family on Goblin watch."

The court found appellant guilty of first-degree terroristic threatening after finding Julia's testimony credible. Appellant filed a timely notice of appeal. This appeal followed.

The decision to admit or exclude evidence is within the sound discretion of the circuit court, and this court will not reverse a circuit court's decision regarding the admission of evidence absent a manifest abuse of discretion.[2] An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court acted improvidently, thoughtlessly, or without due consideration.[3]

The law is clear that a party should be allowed to cross-examine a witness in order to prove bias.[4] The right of cross-examination includes the right to show that testimony is unbelievable because this type of evidence can at times make the difference between conviction and acquittal.[5] The supreme court has found the "denial of cross-examination to show the possible bias or prejudice of a witness may constitute Constitutional error of the first

---

[2]*Jones v. State*, 2011 Ark. App. 324, 384 S.W.3d 22.

[3]*Id.*

[4]*Wilson v. State*, 289 Ark. 141, 712 S.W.2d 654 (1986).

[5]*Winfrey v. State*, 293 Ark. 342, 738 S.W.2d 391 (1987).

7

magnitude as violating the Sixth Amendment right of confrontation."[6]  However, this rule is subject to the harmless error rule.[7]  When determining whether the denial of a party's right to cross-examine a witness for possible bias is harmless error, the court considers a host of factors, including the importance of the witness's testimony, whether the testimony was cumulative, whether evidence existed that corroborates or contradicts the testimony of a witness, and the overall strength of the prosecution's case.[8]  The correct inquiry is whether, assuming that the damaging potential of the cross-examination was fully realized, this court might nonetheless say that the error was harmless beyond a reasonable doubt.[9]

Here, the court stated that appellant could prove that Ben was biased against appellant, but that Ben had not offered any testimony saying or accusing appellant of doing anything. Additionally, the court found that the evidence was irrelevant as it related to the charge that appellant was currently facing.  Appellant failed to offer any evidence against Julia to show that she was influenced  by Ben's bias to falsely accuse appellant of a crime he did not commit. The court noted that the case hinged on credibility, and it found Julia's testimony credible. We hold that the court did not abuse its discretion by excluding the evidence appellant sought to introduce.

---

[6]*Billett v. State*, 317 Ark. 346, 877 S.W.2d 913 (1994) (citing *Henderson v. State*, 279 Ark. 435, 652 S.W.2d 16 (1983)).

[7]*Watson v. State*, 318 Ark. 603, 887 S.W.2d 518 (1994); *Winfrey v.State*, *supra*.

[8]*Winfrey v. State*, *supra*; *Sullivan v. State*, 32 Ark. App. 124, 798 S.W.2d 110 (1990).

[9]*Winfrey v. State*, *supra*.

Even if we did find that the court committed error by not allowing the evidence against Ben in, this error was harmless beyond a reasonable doubt. Julia testified unequivocally that appellant was the person who threatened to kill her on May 27, 2013. The court believed this testimony, and we do not weigh the credibility of witnesses on appeal.[10]

Appellant also contends that the State opened the door when it introduced appellant's Facebook post, and that appellant should have been allowed to question Ben about the proffered evidence. This argument is without merit. Appellant did not object to the evidence until the State sought to admit it as an exhibit. Furthermore, the State stated that the post was introduced to prove appellant's knowledge of the Holleys' residence, a fact which appellant had already admitted. We note that even if the trial court erred in its finding that the State had not opened the door, the error was harmless in light of Julia's testimony against appellant. Accordingly, we affirm.

Affirmed.

GLADWIN, C.J., and ABRAMSON, J., agree.

*James Law Firm*, by: *James O. "Bill" James, Jr.*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Ashley Priest*, Ass't Att'y Gen., for appellee.

---

[10] *Sizemore v. State*, 2015 Ark. App. 295, 462 S.W.3d 364.